[Civ. No. 15971. Second Dist., Div. One. July 7, 1948.]

ALMA L. NEUBER, Appellant, v. ROYAL REALTY
COMPANY (a Corporation) et al., Respondents.

Musick, Burrell & Ingebretsen, Anson B. Jackson, Jr., and James E. Ludlam for Appellant.

Ray L. Chesebro, City Attorney, Bourke Jones, Assistant City Attorney, and Thos. H. Hearn, Deputy City Attorney, as Amici Curiae on behalf of Appellant.

Lasher B. Gallagher, Gibson, Dunn & Crutcher and Norman S. Sterry for Respondents.

WHITE, J.—Plaintiff appeals from a judgment entered against her on a verdict of the jury rendered in favor of the defendants pursuant to direction of the court.

Epitomizing the facts as they appear in the record, it appears that defendant Royal Realty Company is a California corporation (hereinafter referred to as "the company"), and at all times here pertinent, was the owner of certain property at the corner of Wilshire Boulevard and Alvarado Street, in the city of Los Angeles, improved with a "Class C" building.

Defendant Herman Helbush is and at all times herein pertinent was president of the corporation, owner of all its outstanding stock except for one or two qualifying shares, and in charge of the management and operation of said corporation.

Defendant E. R. Livingston was also an officer of the corporation, but as to him a nonsuit was granted at the conclusion of plaintiff's case, and no appeal was taken from the judgment rendered thereon.

On June 22, 1937, defendant corporation through its president, defendant Helbush, entered into a lease with one Norman Noll, doing business under the firm name and style of Noll and Company, for the purpose of conducting in a portion of the aforesaid building" . . . the business of manufacturers of and dealers in club furniture and equipment, and for no other purpose. . . ."

The lease was on a printed form and was accompanied by a letter describing certain changes to be made in the partition-

ing of space, closing up the door opening on the mezzanine floor, and building a new stairway at the rear of the building, after which the letter provided: "Any other changes which may be necessary to the carrying on of your business, and which shall be subject to our approval, shall be at your own cost and expense."

Other provisions of the lease provided as follows: First: "In the event of a breach of any of the other covenants herein contained on the part of the lessee to be kept and performed, it shall be lawful for the lessor or for the heirs, executors, administrators, successors and/or assigns of the lessor to re-enter into and upon the said premises, and every part thereof, and to remove all persons therefrom, and to repossess and enjoy the said premises as in the first and former estate of the lessor, anything to the contrary herein contained notwith-standing."

"Second: That the lessee will not use, or permit to be used, the said premises, or any part thereof, for any purpose or purposes other than the purpose or purposes for which the said premises are leased, demised and let unto the lessee, as hereinbefore specified."

The twelfth paragraph of the lease reserves to the lessor the right "to enter into and upon the said premises at all reasonable times, for the purpose of inspecting same."

Noll entered upon the demised premises and continued in possession thereof until the expiration of the lease on June 22, 1942. Thereafter, he held over as a tenant from month to month under the terms contained in paragraph eleven of the lease, and was in such possession on January 20, 1944, when there occurred a fire which gave rise to this litigation.

The portions of the building on the second floor occupied by the tenant Noll, employer of plaintiff, consisted of a second-floor room designated at the trial as "showroom," and another room designated as "workroom," and two other rooms designated as "storerooms" 1 and 2.

A stairway consisting of 15 risers descended from the floor of storeroom No. 2 to the ground floor of the building immediately under said storeroom. There was a doorway opening inward from the alley immediately east of the building to the ground floor at the bottom of this stairway.

On January 20, 1944, the day of the fire, and for a long time prior thereto, the stairwell descending from storeroom No. 2 to the ground floor was covered with planking which entirely obstructed the stairway, rendering it incapable of

use, and the doorway at the bottom of the stairway, opening inward from the alley, was barred with bolts and a wooden obstruction.

Between the workroom and the showroom at the top of the steps which elevate the floor of the workroom some 2½ to 3 feet above the elevation of the floor of the showroom, was a set of double doors which swung to the south only, or into and not away from the workroom. The westerly of these doors was always closed, being obstructed by a heavy table and cash register which were placed against it on the workroom side.

Plaintiff had been employed by Noll for some months prior to the fire and the table at which she worked was located in the workroom. Her duties consisted of painting or "spotting" the spots on dice. The dice had previously had small holes drilled in their surfaces for the spots, and the latter were made by applying paint in these holes with an instrument called a "nail."

Plaintiff testified that she had never, before the fire, been told by anyone that any of the material in use in the establishment was inflammable or explosive, which testimony was stricken out by the trial court. That Noll himself spent a large part of his time working with his employees in the workroom on various machines. That when Noll was in the workroom he was in the habit of smoking cigarettes. This testimony was also stricken by the trial court, upon motion of the defendant.

During Noll's entire tenancy, the greater part of his activities in the demised premises was the manufacture of dice from nitro-cellulose, which, in finely divided particles is highly inflammable. Dice were fabricated from cubes, and in shaping the cubes shavings were cut from them all the way from large shavings to finely divided particles. These shavings were strewn all over the room and the air impregnated with cellulose-nitrate dust. Noll had attached to several of his cutting machines a blower which blew the shavings and dust out into the room where they settled on the floor, walls and curtains, as well as upon the clothing and persons of the workers. At the close of each day's operation, the refuse, including the sweepings of the nitro-cellulose dust and shavings upon the floor, was swept up and put into gunnysacks which were stacked along the wall until Mr. Noll found it convenient to take them out and burn them.

Another phase of Noll's activities consisted in fastening cloth covers to the surfaces of gaming tables, requiring the use of shellac and other inflammable liquids, and putting monograms upon poker chips, using therefor cellophane and similar inflammable materials. Noll also engaged in cleaning playing cards in large quantities, using therefor an inflammable liquid cleaner the same or similar to that used in dry cleaning establishments. He also trimmed the edges of such cards with a machine which he had in the workroom for that purpose.

There was no suction equipment or contrivance of any kind installed in the workroom, or elsewhere, to remove this debris at its source or at all, nor was any mechanical ventilation provided. The only ventilation of any kind in the workroom was afforded by the doors and windows.

With reference to the manner in which the tenant Noll, employer of plaintiff, conducted his business, respondents at the oral argument epitomized the same as follows: "It must be conceded . . . that he conducted his operations in a highly negligent manner."

The fire around which this litigation centers occurred at the end of a working day, about 5 o'clock on the afternoon of January 20, 1944. At that time there were in the workroom seven employees of Noll—one man and six women. Three met their deaths within a few minutes after the fire started, and the other four, incluidng plaintiff, were very severely burned.

Immediately preceding the fire, plaintiff had left her worktable and, preparatory to going home, was on her way to obtain her purse which she had placed on a shelf immediately west of the stairwell. As she was walking to get her purse there was a loud explosion in the room. Immediately it was filled with flames and smoke. Plaintiff testified there was only a second or an instant between the explosion and the spread of the flames all over the room. Plaintiff grabbed her purse from the shelf, crouched down low, and started north for the double doorway between the workroom and the showroom. After going about 6 feet she fell and by that time her hands and arms were burned so badly she had to drop her purse. When she arrived near the door, the east half of which only was available for use because the west half was obstructed by the heavy cash register and table, she fell over something. During her progress from where she got her purse to the door, smoke, fumes and flames filled the room. As she

lay on the floor near the doorway, something came down from above and struck her on the body. She does not recall how long she lay on the floor near the door because she was not wholly conscious. Subsequently, she did stagger to her feet, the door was open, she went out through the doorway and fell down the steps between the workroom and the showroom.

The cause proceeded to trial on the amended complaint containing thirteen causes of action, and an amendment filed thereto.

The first cause of action contains all of the charges of negligence and ordinance violations to be found in the entire amended complaint, and may be digested as follows: After alleging in the first three paragraphs that defendant corporation conducted all its business through its president and secretary, defendants Helbush and Livingston, the ownership and construction of the building by defendant corporation, a description of the same, the lease to Noll, his occupancy on a month-to-month tenancy subsequent to the expiration of the lease, and that for a long time prior to the date of the fire, to the knowledge of the defendants, the stairwell of the stairway leading to the alleyway had been covered with heavy planking, entirely obstructed, and that the stairway opening from the ground floor of the building onto the alley had been barred and obstructed, that one-half of the double doorway leading from the workroom into the showroom had been blocked off and obstructed by a heavy table being placed against it with a heavy cash register on the table, the amended complaint in paragraph IV alleges that Noll, prior to the lease, had been engaged in the manufacture of gaming equipment, including the manufacture of dice out of nitro-cellulose, and that he, Noll, expected to continue such manufacture of dice, and that in addition thereto, he was engaged in the business of cleaning playing cards, and that for such purposes he kept volatile liquids customarily used for dry cleaning clothes.

In paragraph V it is alleged that he kept in the workroom and storerooms in excess of 1,000 pounds of cellulose-nitrate cubes and also quantities of inflammable liquids. It is then alleged that the workroom was equipped with various machinery, consisting of drills, milling machines, polishers, lathes, grinders, etc., which were electrically driven; that the cubes were cut to the size desired, holes drilled in them which were later filled with inflammable paint substances, and the manufactured dice kept in "tote" boxes. It is alleged that

cellulose-nitrate is a violent explosive containing within its own structure the oxygen necessary for combustion, and that common practice required the use of preventive measures to prevent the accumulation of dust and small shavings, and that electrical equipment be grounded, operations isolated, clothing frequently washed, spark-proof type shoes worn, and dust and cuttings removed.

In paragraph VI it is alleged that on the 20th of January, 1944, plaintiff was one of seven employees engaged in the process of manufacturing and fabricating dice from cellulose-nitrate; that plaintiff's particular work consisted of painting the spots on dice with inflammable paint; that at about 5 o'clock on said day, the atmosphere in the said workroom was filled with quantities of cellulose-nitrate shavings, dust, and accumulations that without warning suddenly exploded and ignited, causing all of the air in said room to be ablaze and in flame; that plaintiff attempted to leave the workroom, by the only exit, to wit, half of the double door between the workroom and the showroom; that the other employees had simultaneously attempted to escape but were overcome by flames, heat, and gases, and had fallen to the floor in front of the doorway; that the said doorway was obstructed and incapable of use, and the bodies of the employees made it impossible to open the door; that plaintiff was overcome with heat, gas, and flames, became unconscious, and fell to the floor, approximately in front of the doorway.

In paragraph VII it is alleged that as a result of said explosion and fire and inability to escape from the room, plaintiff suffered and sustained serious and severe burns, which it is alleged resulted in general damages of $100,000.

Paragraph VIII alleges special damages in the sum of $6,500.

Paragraph IX alleges that prior to the fire, she had an earning power of $30 per week.

In paragraph X it is alleged that long prior to January 20, the defendants negligently permitted Noll to carry on and conduct the operations described in the complaint, with full knowledge of the conditions surrounding the manufacturing and processing of said dice, and with knowledge that the manufacturing and processing of dice was negligently and unlawfully conducted, without the use of reasonable care, and that the negligence of the defendants contributed proximately to the flash fire and explosion.

Each of the remaining causes of action realleged all of the averments of the first cause, then set out special averments by which it was evidently intended to limit the particular cause of action to some one element included in the first cause of action.

Thus, in the second cause of action the specific charge is failure to have a fire escape.

The third cause of action charged failure to have an exhaust system whereby dust and shavings, vapors and fumes were drawn out of the room; negligent failure to heat the rooms with steam heat, so that the sole means of heating was an ordinary domestic type gas heating stove with an open flame, negligent failure to require any no-smoking signs to be installed in the room, and negligent failure to have the electrical equipment for the operation of the motors properly insulated.

The fourth cause of action charged negligence in not having two exits in the room.

The fifth cause of action charged negligence in permitting the storage of cellulose-nitrate in the storerooms without having proper explosive vaults for them.

The sixth cause of action, negligently failing to have an explosion hatch in the ceiling.

The seventh cause of action, negligently failing to have a stairway to the roof.

The eighth cause of action charged negligence in not having the proper electrical installations for the electrical equipment used by Noll to operate his machinery.

The ninth cause of action was the same as the eighth, except that it is alleged as to the electrical wiring.

The tenth cause of action charged further negligence in regard to not properly equipping the electrical motors with ventilation and dust-proof housing, etc.

The eleventh cause of action charged negligence with reference to wiring enclosures, motors, and electrical appliances used by Noll.

The twelfth cause of action charged that the defendants furnished an open gas heater for heating said room.

The thirteenth cause of action charged that the acts and omissions of the defendants constituted a public and private nuisance.

By their answer, defendants admitted the ownership of the building, the leasing of the premises to Noll, and generally admitted upon information and belief of the defend-

ants, obtained subsequent to the fire, that Noll had blocked off the stairwell from the storeroom floor and barricaded the door at the foot of the stairs opening onto the alley, and blocked off half of the door between the workroom and the display room, but denied that any of these facts were known to the defendants before the fire; and likewise admitted generally the manufacture of dice by Noll on the premises, but denied that either the fabrication of dice or that they were manufactured out of inflammable material was known to the defendants prior to the fire. It is alleged in the third paragraph of the answer that at the time of the making of the lease, the defendants were informed that Noll did not intend to manufacture gaming equipment but simply to assemble the same.

The answer also contained a plea of contributory negligence on the part of the plaintiff.

By an amendment to the answer, the defendants pleaded assumption of risk by the plaintiff.

When the cause was called for trial, defendants, pursuant to notice of motion theretofore given, moved the court for judgment on the pleadings, basing said motion on the ground that the amended complaint did not state a cause of action against the defendants, jointly or severally. In denying the motion, the court prepared a written opinion which we here epitomize because it may aid the clarity of this decision in that it decides the following points to which the court adhered throughout the trial:

(1) That the plaintiff as an employee of Noll had no greater rights against the lessor than had Noll.

(2) That a lessee and his employees had a right of recovery from the lessor for injuries resulting from the dangerous condition of the premises only where the dangerous condition was not apparent, and was known to the lessor and not to the lessee; that the basis of the landlord's liability was not the dangerous condition of the premises but the concealment thereof, and that a lessee who rented premises in a dangerous condition knowing of that condition assumed all the risks incident thereto.

(3) That the above rules were not applicable to the nonperformance by a lessor of a statute or ordinance requiring certain structural or safety devices in the building, the trial court observing:

"On the other hand, in the case of a duty imposed by statute, it is not the concealment which renders the owner

liable, but the continued existence of the danger which has been inhibited by the statute.''

(4) That this rule, however, applied only to ordinances which were required of a building as a building, and not to ordinances which were violated only by the use which Noll, the tenant, made of the premises leased to him.

(5) That the complaint did not disclose contributory negligence or assumption of risk as a matter of law.

The further suggestion was made by the court that a saving of time as well as an orderly procedure would be enhanced if before the empanelment of the jury, court and counsel would examine the various ordinances which plaintiff intended to offer in evidence, to the end that before trial, both parties would know what ordinances would be received in evidence.

Following such discussion the court rendered an oral opinion in which it held that the plaintiff could not recover upon the thirteenth clause of action based upon the theory that the premises created a nuisance, this because: (1) The common law action of nuisance was based upon a use of land which damaged adjoining land or damaged or inconvenienced persons having a right upon adjoining land, and (2) that the alleged nuisance was created not only by Noll but by his employees as well.

With reference to the ordinances and safety regulations which counsel for plaintiff had apprised the court they relied upon, they were grouped by the court into three classifications, viz.:

''(1) Any requirements which have to do with the structure of the building itself as a building designed for a general purpose—such as a garage, hospital, or theater—place a duty upon the owner to comply therewith.

''(2) Any requirements for specific installations in the building have to do with safety measures incidental to the special activity of the tenant in his operations—such as special type of machinery or things deemed necessary to reduce the danger of its use, as for instance a suction dust remover—place a duty solely upon the occupant in charge of such operations and not upon the owner, whether their installation incidentally involves some alteration in that portion of the building or not.

''(3) Any requirements as to the manner in which the activity is to be carried on—such as not placing furniture in front of a door, or using only manila envelopes as con-

tainers for certain materials—place a duty upon the occupant in charge of the operations and not on the owner. . . ."

Throughout the trial the court consistently abided by the views expressed in the just-quoted oral opinion, receiving in evidence all ordinances and safety regulations falling within the first classification, and rejecting those that fell within the second and third.

Before the introduction of any evidence, the defendants, each separately for himself and itself, objected to the introduction of any evidence either under the complaint or under any of the causes of action therein stated, on the ground that the complaint did not, nor did any cause of action therein, state facts sufficient to constitute a cause of action against the defendants, jointly or severally. The objection was overruled as to the first twelve causes of action and sustained as to the thirteenth.

While the court admitted a number of ordinances into evidence, there was only one the violation of which it was held proximately contributed in any way to plaintiff's injuries. This was section 91.3303 of the Building and Safety Ordinance of the city of Los Angeles, which provided that every exit door serving an aggregate floor space of more than 1,000 square feet should swing outward instead of inward.

In accordance with its foregoing basic rulings, the trial court held that the only issue to be submitted to the jury was whether the fact that the door between the workroom and the showroom swung inward instead of outward proximately contributed to plaintiff's injuries. In this regard, defendants contended that there was no violation of the aforesaid ordinance No. 91.3303 for the reasons: (1) the ordinance was not applicable to existing buildings, but only to those constructed after its adoption; (2) the square footage of the room in question was not in excess of 1,000 feet. The court, however, held otherwise, but directed a verdict for the defendants on the ground that the evidence affirmatively established as a matter of law that the manner in which the door swung in no way interfered with or impeded plaintiff's exit from the workroom.

We shall first give consideration to appellant's claim that regardless of ordinance requirements which she claims were violated, there was sufficient evidence under the first cause of action to warrant submission to the jury of the question whether defendants were guilty of common law negligence

or lack of ordinary care, which proximately contributed to her injuries.

In support of this contention, appellant asserts that under the facts proven or offered to be proven upon the trial, "defendants were guilty of general or common law negligence which proximately caused her injuries, especially in view of the fact which must be assumed for the purposes of this appeal, that they at all times during Noll's tenancy in their building knew all about his activities therein, that these were highly negligent and dangerous and that the defendant owners permitted them to continue until the disaster occurred on January 20, 1944, although they at all times under their lease had the absolute power to stop them, and that the question of whether they were or were not guilty of negligence by reason of these facts was, at the least, one for a jury to determine."

Appellant's contention in this regard is that, entirely aside from claimed law violations, Noll's admittedly grossly dangerous and negligent use of the premises through his operations therein were at all times known to respondents. That under the lease and at all times after its expiration up to the date of the fire, respondents had the right to enter upon the premises "for the purposes of inspection," which right asserts appellant it is only fair to assume was reserved so that respondents might be in a position to learn of and stop dangerous or illegal operations by the tenant. That under a covenant contained in the lease, the tenant Noll was obligated to conduct his tenancy in a lawful manner, and that a violation of this covenant entitled the lessor to terminate the tenancy, thereby eliminating the tenant's dangerous, negligent and illegal conduct upon the demised premises. That under the terms of the lease the tenant had no power or right to make structural alterations in the building so as to make his operations therein safe or legal.

■ There can be no doubt that the general rule is that the landlord is not liable for injuries to the person or property of the tenant or his invitees or employees caused by defects in the leased premises, the rule amounting to an application of the doctrine of *caveat emptor*. Equally well settled is the rule that the doctrine just enunciated is subject to the exception that if there be some hidden defect in or danger on the premises, which is known to the lessor at the time of executing the lease, but which is not apparent to the prospective lessee, the lessor is obligated to inform the lessee

thereof. Failing so to do, the lessor renders himself liable for injuries sustained by the lessee resulting from such hidden defect. And that as to the tenant's employees or other invitees (except as to the lease of public or semipublic buildings), the landlord is liable to the same exent as he would have been had the tenant been injured (*Shotwell* v. *Bloom*, 60 Cal.App.2d 303, 309, 310 [140 P.2d 728]). In the case just cited, at page 310, we find the following:

"Stated another way, the landlord's liability, except in the case of public and semi-public buildings where his liability is greater (see *King* v. *New Masonic Temple Assn.*, 51 Cal. App.2d 512 [125 P.2d 559]), is no greater to the invitee of the tenant than it would be to the tenant himself."

In the instant case we are not confronted by a situation wherein the dangerous condition of the premises was brought about through faulty construction or by any hidden defect or danger existing on the premises at the time the lease was executed. But we are met with a dangerous condition resulting from the concededly grossly negligent manner in which Noll, the lessee, conducted his operations on the premises. And it must be conceded that the danger emanated from the use which Noll made of the premises, a use which he made thereof through the services of his employees, including appellant.

We are convinced that under well-established principles, appellant's claim of common law negligence must be founded upon the proposition that respondent lessor company and its officers owed to Noll as the company's lessee, and to appellant as Noll's employee, a duty to prevent them from injuring themselves by the careless and negligent manner in which Noll, through his employees, carried on and conducted his business in the demised premises.

As was said by this court in *Palmer* v. *Crafts*, 16 Cal.App. 2d 370, 374, 375 [60 P.2d 533]:

"In order to constitute an actionable tort, there must be a legal duty—imposed by statute or otherwise—owing by the defendant to the one injured, for in the absence of such a duty any damage caused is injury without wrong—*damnum absque injuria*. (*Wilson* v. *Union Iron Works Drydock Co.*, 167 Cal. 539 [140 P. 250]; *Mernin* v. *Cory*, 145 Cal. 573 [79 P. 174]; *Smith* v. *Whittier*, 95 Cal.279 [30 P. 529]; *People* v. *Schmitz*, 7 Cal.App. 330, 370 [94 P. 407, 15 L.R.A.N.S. 717].) The existence of such a duty must appear in the allegations of the complaint as a necessary prerequisite essential to the statement of a cause of action; and we find in the

averments of the complaint before us no such duty existing, nor does a reading of the evidence in this case indicate the existence of any such duty on the part of appellant to respondent. In view of the relation existing between the parties here, as shown by the pleadings, coupled with the circumstances surrounding the accident where appellant and respondent were engaged in a joint enterprise and respondent was injured while performing an act in the furtherance of their joint adventure, we are unable to percieve the existence of any duty reposing upon appellant the violation of which resulted in injury to respondent. In order to constitute actionable negligence, there must exist three essential elements —namely, a duty or obligation which the defendant is under to protect the plaintiff from injury; a failure to discharge that duty; and injury resulting from the failure. Not only must the complaint disclose these essentials, but the evidence must support them, and the absence of proof of any of them is fatal to a recovery. (*Means* v. *Southern California Ry. Co.*, 144 Cal. 473, 478 [77 P. 1001, 1 Ann.Cas. 206].)''

That no tortious liability can be imposed upon a defendant even though he was negligent, unless there was a duty of care owed by defendant to plaintiff, was the holding in *DeMotte* v. *Arkell*, 77 Cal.App. 610, 621 [247 P. 254]; *Coleman* v. *California etc. Church*, 27 Cal.App.2d 579 [81 P.2d 469]; *Toomey* v. *Southern Pacific R.R. Co.*, 86 Cal. 374 [24 P. 1074, 10 L.R.A. 139]; *Grundel* v. *Union Iron Works*, 141 Cal. 564, 566, 567 [75 P. 184]; *Leslie* v. *City of Monterey*, 139 Cal.App. 715, 719, 720 [34 P.2d 837]; *Hall* v. *Southern Cal. Edison Co., Ltd.*, 137 Cal.App. 449, 452, 453 [30 P.2d 1013]; *Slyter* v. *Clinton Construction Co.*, 107 Cal.App. 348, 353 [290 P. 643]; *Jacobson* v. *Northwestern Pac. R.R. Co.*, 175 Cal. 468, 472 [166 P. 3]; *Smelser* v. *Deutsche Evangelische, etc.*, 88 Cal. App. 469, 475, 476 [263 P. 838].

Let us assume, as contended by appellant, that respondents were at all times aware of the careless and negligent manner in which Noll, the tenant, was conducting his business on the premises, and of the dangerous condition thereby created, of what existing dangers were respondents required to warn appellant of she was not cognizant and which were not readily apparent to her? Further, assuming that appellant was an invitee on the premises, and that respondents were burdened with the duty of exercising ordinary care to prevent injury to her, nevertheless, the danger being obvious, appellant had equal, if not superior knowledge of

the dangerous conditions which brought about her injuries. Under such circumstances, the authorities are uniform in holding that the owner of the property can rely on the assumption that an invitee will perceive that which would be obvious to him through the ordinary use of his own senses. To have warned appellant herein would be but to inform her of dangers and conditions which she herself saw throughout each day she worked on the premises. The dangers being manifestly obvious, the respondent lessor company and its officers were not required to give appellant notice thereof. (*Funari* v. *Gravem-Inglis Baking Co.*, 40 Cal.App.2d 25, 29 [104 P.2d 44]; *Vitrano* y. *Westgate Sea Products Co.*, 34 Cal.App.2d 462, 466 [93 P.2d 832]; *Shanley* v. *American Olive Co.*, 185 Cal. 552, 555 [197 P. 793]; *Weddle* v. *Heath*, 211 Cal. 445, 452 [295 P. 832]; *Mautino* v. *Sutter Hospital Assn.*, 211 Cal. 556, 560 [296 P. 76]; *Goldstein* v. *Healy*, 187 Cal. 206, 211 [201 P. 462]; *Blodgett* v. *B. H. Dyas Co.*, 4 Cal. 2d 511, 512 [50 P.2d 801].)

We are persuaded that it must be held, eliminating consideration of ordinance violations, to which we shall later give consideration, that the evidence was insufficient to warrant submission to the jury under the first cause of action of the question whether respondents were guilty of common law negligence or a lack of ordinary care, which proximately contributed to appellant's injuries.

Aside from any consideration of ordinances or the violation thereof, it must be held that the evidence failing to disclose the breach of any common law duty owed by respondents to appellant, the latter can not recover whether the negligent and careless manner in which the lessee Noll conducted his operations be characterized as a dangerous condition or as a nuisance. If respondent owed no duty to the employees of Noll to warn them against participating daily in the creation or maintenance of what amounted either to a dangerous condition or a nuisance, whichever term is applicable, then appellant can not recover. Her right to recover is not increased or augmented by labeling the condition a nuisance nor is that right in any degree lessened by labeling it a negligent and dangerous condition. Her right to recover rests upon whether respondents owed her any duty to prevent the existence and continuation of the condition complained of. As heretofore pointed out, exclusive of claimed ordinance violations, respondents owed no such duty to appellant under the circumstances here present.

We come now to a consideration of the correctness of the court's rulings excluding from the evidence certain ordinances offered by the appellant.

In this regard, appellant challenges the trial court's ruling that when, on January 1, 1943, ordinance No. 87,000 entitled, ''An Ordinance Amending, in Its Entirety, Article I of Chapter 9 of the Los Angeles Municipal Code, Being the Article Commonly Called 'The Building Code' '' became effective, it repealed the existing or ''old'' Building Code. The court held that on and after January 1, 1943, the Building Code of the city of Los Angeles ''consisted entirely of what was thereafter said in that (the amending) ordinance, and nothing else. That everything that was in the old ordinance and not contained in the new one was repealed thereby.''

This ruling was correct. Over a long period of time it has been the rule in this state that no statute shall be held retroactive unless such intention clearly appears. All laws and ordinances are to be construed according to the intention of the legislative body enacting them, and in ascertaining that intention the courts must presume a prospective and not a retrospective operation was intended unless such presumption is negatived by express language. There is nothing in the ordinance now before us which would indicate that it was to be retroactive. On the contrary, the language in section I of the ordinance provides that the then existing ordinance ''is hereby amended in its entirely so as to read as follows:...''

Appellant asserts that if this ruling is correct it would remove all buildings in the city of Los Angeles, including respondent company's building, from control by any Building Code or ordinance unless they were controlled by some provision of the new Building Code. While courts can not concern themselves with the wisdom of legislative enactments that are within the constitutional power of the legislative branch of the government, it is at once apparent that the city council intended the ordinance to apply to buildings thereafter to be constructed except insofar as the provisions of the new ordinance should be made applicable to existing buildings. Had the legislative intent been otherwise, it could easily have been made manifest. It is not within the providence of the courts to rewrite the ordinance.

Manifestly, the new ordinance was intended as a substitute for the existing one. Such being the case, the latter or substituted ordinance repeals the former. The new ordinance

must from its very terms be regarded as revisory of the entire matter of the earlier ordinance, and the latter must be held to have been superseded. The language "amended in its entirety so as to read as follows" can only mean that the legislative body had made a new and complete expression of its will upon the subject of building control. Therefore, this last expression must prevail, and whatever is excluded therefrom must be ignored (*Charnock* v. *Rose,* 70 Cal. 189, 192 [11 P. 265]; *Bond* v. *Farmers & Merchants National Bank,* 64 Cal.App.2d 842, 845, 846 [149 P.2d 722]; *Treadwell* v. *Yolo County,* 62 Cal. 563, 564; *Dillon* v. *Bicknell,* 116 Cal. 111, 114 [47 P. 937]; *Mack* v. *Jastro,* 126 Cal. 130, 132 [58 P. 372]).

It would unduly prolong this opinion to her set forth in detail the various ordinances offered in evidence and rejected by the court. Generally speaking, they fall into two classes:

■ (1) The stairway and ramp ordinance, which ordinance applied to a building as a building and not to its use. This ordinance was properly excluded as not being applicable to existing buildings, and for the reasons heretofore stated, was applicable under the new Building Code to buildings thereafter to be constructed. The ordinance required that all interior stairways and interior ramps shall be enclosed with fire-resistant materials or walls. There is much to be said in favor of respondent's contention that the provision was intended for stairways exterior to offices such as are found in most office buildings where the floors are connected one after another with a continuing stairway at one side of the building which can be used as a means of exit in case of fire or other emergency, and that the provision in question was not intended to apply to an intercommunicating stairway of the character of the one here involved, simply between two floors. ■ But, assuming the stairway had been enclosed with fire-resistant material, there is no evidence in the record or offer to prove that appellant's burns would have been any less severe. Furthermore, she could not have escaped because the stairway leading from the mezzanine floor to the alley had been blocked by the stairwell being covered over and the door at the bottom being secured. But the blocking of this exit way was the act of Noll, the tenant. It was not a structural part of the building. Indeed, as leased and turned over to Noll, the stairway furnished a safe and sufficient exit from the mezzanine floor to the alleyway. Noll's blocking it by planks placed over the stairwell

and barricading the door was not an act of the respondents and had no connection whatever with the fact that the stairway between the storeroom and the workroom was not enclosed with fire-resistant material.

Though it be conceded that this provision of the ordinance was applicable to existing buildings—and we think it is clear that it was not—the question of whether the open stairway proximately contributed to plaintiff's injuries could not have been submitted to the jury without inviting them to indulge in conjecture and speculation. When it appears that the facts and circumstances from which a conclusion is sought to be deduced, although consistent with that theory, are equally consistent with some other theory, they do not support the theory contended for.

(2) Ordinances which were claimed to have been violated, not by the structure of the building as a building, but by the use which the tenant Noll made of the leased premises, or which were excluded by the court because of its rulings that respondents were not responsible for such ordinance violations by Noll, as lessee.

Generally speaking, the ordinances in this category fell roughly into three classes or groups:

(A) Ordinances making certain requirements for a building in which cellulose-nitrate was handled or stored (such as the ordinances requiring explosion vaults where a certain quantity of the material was kept, and a sprinkler system where the material was processed).

(B) Ordinances which required manufacturers to take certain precautions in the operation of their machinery.

(C) General, miscellaneous ordinances.

The court below sustained objections to all of these proffered ordinances on the ground that appellant being an employee of Noll the lessee, stands, as to the lessor, in the shoes of the lessee, and has no greater or different right against the lessor because of defects in the leased premises than has the lessee; that necessarily, when a lessee rents premises that are safe as leased, but are rendered unsafe by his use of them, neither the lessee nor his employees can recover from the lessor for injuries resulting from that condition. In this view the trial court is supported by a long, uniform and unbroken line of decisions in this state. (See *Shotwell* v. *Bloom, supra,* p. 310.) To the same effect are a veritable forest of cases, including *Runyon* v. *City of Los Angeles,* 40 Cal.App. 383, 392

[180 P. 837] ; *Donohoo* v. *Kress House Moving Corp.,* 25 Cal. 2d 237, 242-243 [153 P.2d 349] ; *Singer* v. *Eastern Columbia, Inc.,* 72 Cal.App.2d 402, 410-411 [164 P.2d 531] ; *Scholey* v. *Steele,* 59 Cal.App.2d 402, 405 [138 P.2d 733].

The premises as leased to Noll were structurally safe and except as to the construction of the door between the showroom and the workroom, to which we shall later give consideration, there was no failure to comply with any ordinance affecting the building as a building. The lack of safety of the premises and their failure to comply with the ordinances now engaging our attention, was caused solely by Noll's operations and the manner in which he conducted his business.

Under the foregoing rule, so firmly established in this state, the question then arises as to whether Noll, had he been injured in the fire could have successfully prosecuted an action against the landlord, and would the ordinances have been admissible in his favor as against respondents? The answer is obvious. As an employee of the lessee Noll, appellant was in exactly the same relation to the lessor as Noll. Appellant concedes that in the present case the tenant Noll could not recover for any injury he might have sustained as a result of the dangerous condition in the maintenance of which he participated, but insists that in the instant case the lease gave the respondent lessor company the right to reenter at all times, obligated the tenant Noll to comply with the law, invested the lessor with the right to cancel the lease if the law was not complied with, and prohibited the tenant from making any alterations in the building without the written consent of the lessor. That respondent owners had full and complete knowledge of the illegal and negligent activities being conducted in the premises during Noll's entire period of occupancy. That respondents were joint tort-feasors with the tenant Noll, and were guilty of negligence and unlawful conduct which concurred with that of Noll to create the continuing grossly dangerous condition which resulted in serious injury to the appellant. That where the cause of injury is created by the license, consent or concurrence of the landlord, he becomes the principal of or joint tort-feasor with the tenant in doing the wrongful act or in the maintenance of the dangerous condition and becomes responsible to a third person injured thereby. That the liability in such a case results, not from his status as lessor, but is fundamental, and the result of participation in the wrong.

In analyzing the cases cited by respondents, it would at first appear difficult to harmonize them with the view taken by the courts of this state. But a careful perusal of the authorities relied upon by appellant fails to reveal one wherein the landlord was held responsible under facts and circumstances similar to those present in the case at bar. In none of them do we find a situation where the plaintiff was an employee of the lessee, and where the dangerous conditions resulting from violations of ordinances or negligent operation were effected by the lessee through his employees, of whom the injured plaintiff was one.

Two California cases are cited by appellant, the first of which is *Dennis* v. *City of Orange,* 110 Cal.App. 16 [293 P. 865]. A mere recital of the factual situation presented in that case will demonstrate clearly that it is distinguishable from the case now engaging our attention. In the cited case the city rented a portion of a riverbed for the purpose of permitting the excavation of sand. The lessee excavated the sand in such a negligent manner as to make it certain that during high water the current of the stream would be diverted. After the tenancy had ended, the city, without attempting to rectify the condition, released the portion of the riverbed, and at the time of the next high water the stream was diverted, with the result that it washed out the land of the plaintiff, who was a lower riparian owner on the opposite side of the stream. The court properly held that the city was liable, pointing out that if the flood had occurred during the original term, the city would not have been liable, but that when the tenancy ceased and the city had a right to reenter and take possession of the premises it was its duty to rectify the nuisance created by the tenant. Suppose, however, instead of the plaintiff being a lower riparian owner the lessee had put his own machinery upon the land that was washed out and the machinery had been damaged or destroyed. Could it for a moment be contended that he could recover?

The case of *Harmon* v. *M. H. Sherman Co.,* 29 Cal.App.2d 580 [85 P.2d 205], is not helpful to appellant because that case fell within the rule of an ordinance applicable to a building as a building, and not to any special use the tenant made of the building. The points raised were not analogous to the issues urged in the case now before us.

From other jurisdictions, appellant cites the cases of *Deutsch* v. *Max,* 318 Pa. 450 [178 A. 481]; *Swift & Co.* v. *People's*

*Coal & Oil Co.*, 121 Conn. 579 [186 A. 629] ; *Patterson* v. *Schlitz Brewing Co.*, 16 S.D. 33 [91 N.W. 336]. Whatever may be said in these and other cited cases which might be regarded as varying and modifying the rule so firmly established in this state cannot prevail. And finally, it may be said that appellant's theory breaks down for lack of any legal duty on the part of respondents to prevent the violations of ordinances by either the tenant Noll or by appellant, his employee.

The following language of the Supreme Court of Kansas in *Bailey* v. *Kelly*, 93 Kan. 723 [145 P. 556, 559], seems to us timely and pertinent to the instant case: ''To ingraft an exception upon the law for this particular case is to recognize the first of a wilderness of single instances. To cistern cases must soon be added cases involving defective railings about steps, stairways, porches, and areas, whereby the tenant's servants are injured. If after the fact of a distressing accident a jury should conclude to find negligence in maintaining some structure or place where the tenant's children invited some friends to play, the landlord must respond in damages. The list is certain to grow until it may be impossible to say what is the rule and what an exception. If the property law of the state is to be changed, and a general duty is to be imposed upon the landlord to make his premises secure for use by tenants and whomsoever a tenant may invite there, the Legislature should create the obligation, and not the courts.''

The court did not err in its rulings excluding the ordinances in question.

Appellant next urges that the court erred in its rulings as to the nonapplicability of certain sections of the Labor Code and in denying admission into evidence of certain safety orders promulgated by the Industrial Accident Commission.

 The rejection of these code provisions and safety orders was proper. They deal primarily and exclusively with the relationship of employer and employee. As heretofore pointed out, the premises were safe when leased to Noll and it was his use and occupancy thereof that rendered them unsafe and hazardous. The Industrial Accident Commission is without power to establish rules of law applicable between landlord and tenant.

 Section 21 of article XX of the Constitution of California grants to the Legislature power to delegate to the Industrial Accident Commission the authority to make regu-

lations affecting only the relationship of employer and employee. That the Industrial Accident Commission is without authority to impose liability upon third persons for injuries was the unequivocal holding in *Pacific Gas & Electric Co. v. Industrial Acc. Com.*, 180 Cal. 497, 501 [181 P. 788]. See, also, *Hayden v. Paramount Productions, Inc.*, 33 Cal.App.2d 287, 296, 297 [91 P.2d 231].

No error was committed by the court in sustaining objections to the introduction into evidence of the zoning ordinance of the city of Los Angeles. The primary purpose of zoning ordinances is to prevent the property of one person from being damaged by the encroachment of a neighboring property in a manner not compatible with the general locality of the two properties. For instance, to prevent residence property from being impaired by property devoted to business purposes.

In the zone in which the demised premises herein were located, certain classes of business, not including the tenant Noll's business, were permitted and a certain percentage of floor space only could be used for manufacturing. The zoning ordinance was not designed to protect employees within a particular zone from injuries received by fire in the course of their work. Such protection is afforded by the fire ordinances of the city. The fire with which we are here concerned did not ensue because more of the floor space of the demised premises was used for manufacturing purposes than was permitted in the zone within which the property was located, but resulted from the negligent and grossly careless manner in which Noll, through his employees, carried on and conducted his business. Not being within any class of persons which the zoning ordinance was designed to protect, appellant cannot claim that such violation constituted negligence (*Corbett v. Spanos*, 37 Cal.App. 200, 204 [173 P. 769]; *Figone v. Guisti*, 43 Cal.App. 606, 608, 610 [185 P. 694]; *Hitson v. Dwyer*, 61 Cal.App.2d 803, 807, 808 [143 P.2d 952]). It also appears manifest that the claimed violations of the zoning ordinance could not have been a proximate cause of appellant's injuries.

Appellant next insists that respondent company's claimed violation of section 91.0315 of the new Building Code was a proximate cause of the fire and appellant's injuries.

The section in question provides that "No building or structure or portion thereof shall be used or occupied until a certificate of occupancy has been issued therefor."

However, the section contains exceptions reading as follows:

"1. No existing building or portion thereof shall require a Certificate of Occupancy unless the occupancy housed therein is different from that for which the original permit was issued.

" (b) *Change of Occupancy.* Each change of occupancy to one classified in a different sub group shall require a new Certificate of Occupancy whether or not any alterations to the building are required by this code."

Since no Certificate of Occupancy had been required at the time of execution of the lease and there had been no change of occupancy since the ordinance became effective, it would seem manifest that Noll's occupancy of the premises clearly fell within the exceptions.

Appellant earnestly insists that the ordinance imposed a duty on the owner to apply for and obtain a Certificate of Occupancy, but we fail to find in the section any such requirement. It is true that the section provides "the Superintendent of Buildings shall issue a Certificate of Occupancy, without charge, to the owner of the building." But we fail to see wherein this language places upon the owner the obligation to make the request or application, and simply means that when issued, whether upon request of the owner, architect, contractor or tenant, it shall be issued in the name of the owner. This conclusion is fortified by further language in the ordinance dealing with inspection, which provides that when an inspection is made the "inspector shall advise the *applicant* (not owner) of those alterations necessary."

As to the failure of the owner to make application for a Certificate of Occupancy being the proximate cause of the fire and consequent injuries to appellant, it is argued that had such application been made the required inspection would have resulted in a denial of the certificate authorizing use of the premises for the purposes of Noll's business, the lease would not have been executed, the fire would not have occurred in this locality and appellant would not have been injured. Aside from the fact that such an argument may be strictured as being based wholly upon conjecture and speculation, we are impressed that it is decisively answered by the statement that the responsibility for the fire must be laid at the door of the person or persons who created the condition that resulted in the fire. In the instant case the conditions resulting in the fire were created by the lessee Noll through the grossly negligent manner in which he conducted his operations. Noll could have so conducted his business that the hazards of fire would

have been minimized if not eliminated. Whether Noll had a Certificate of Occupancy or not, the fire would have occurred as it did because of the negligent manner in which the business was conducted, and not by reason of any structural changes that might or could have been made in the building. ·

The reasoning contained in the case of *Merrill* v. *Los Angeles Gas & Electric Co.*, 158 Cal. 499 [111 P. 534, 139 Am.St.Rep. 134, 31 L.R.A.N.S. 559], we feel, sustains our position.

■■■ Appellant urges that the court erred in refusing to receive any of the vast number of ordinances offered in evidence as exhibits so that the jury could take them to the jury room, and in limiting their admission to the purpose of informing the court as to what was the law of the city of Los Angeles, so that the court could correctly charge the jury with reference to what constituted a violation of any applicable ordinance. While courts take judicial knowledge of statutes, but not of ordinances, it would seem to us just as improper to submit ordinances to the jury for interpretation as it would be to hand them a copy of the Civil Code for them to peruse in determining what the law of the state was. Just as in the case of statutes, the proper construction of an ordinance is a question not for the jury but for the court (43 C.J. § 903, p. 569). The trial court was therefore correct in its rulings that it was for the court to instruct the jury as to the meaning of the ordinances in regard to issues in the case with reference to which such ordinances were offered (*Hirsch* v. *James S. Remick Co.*, 38 Cal.App. 764, 773, 774 [177 P. 876]; *Merced County* v. *Fleming*, 111 Cal. 46, 51 [43 P. 392]).

Appellant offered in evidence some 24 photographs taken officially by the Los Angeles City Fire Department on the evening of January 20, 1944, shortly after the fire was extinguished or during the morning following. These photographs showed portions of the workroom, views of the storeroom, a view of the doorway opening into the ground floor from the alley on the east side of the building, showing the wooden prop and one of the bolts blocking the use and opening of this door. All were excluded by the trial court.

■■■ The photographs of the barricaded door might have been admissible if there had been any issue as to the fact that it was so barricaded, but that fact was admitted by respondents' answer and conceded at the trial.

As to the other photographs, they were excluded upon the ground that there was no showing that they represented the

condition of the premises during the time appellant was in the workroom, and that they depicted nothing but situations concerning and connected with the tenant Noll's activities in the premises for which respondent company had no liability or responsibility.

In view of the rulings of the court that, except for the violation of the ordinance as to the door, none of the ordinances imposed a duty on respondents for the violation of which appellant might recover, rulings with which we are in accord, it is obvious that the refusal to receive in evidence the photographs other than the one showing the condition of the door, was immaterial and could not have prejudiced appellant. As to the ruling on the admissibility of the photograph of the door, we shall hereafter give consideration thereto when we determine the correctness of the court's ruling that there was no evidence sufficient to justify the submission to the jury of the question as to whether the violation of the ordinance concerning the door had any causal connection with appellant's injuries.

Appellant asserts that the court erred in sustaining an objection to the introduction of any testimony by her under the thirteenth cause of action, based upon the theory of nuisance. In this contention, appellant cannot be sustained.

We do not deem it necessary to here set forth the historical aspect of the cause of action based on nuisance, a word concededly used very indiscriminately and loosley as well as very often denoting negligence. As is said in Prosser on Torts, page 549, with reference to the word "nuisance": "It has meant all things to all men, and has been applied indiscriminately to everything from an alarming advertisement to a cockroach baked in a pie. There is general agreement that it is incapable of an exact or comprehensive definition."

Insofar as the present case is concerned, the "nuisance" theory adopted in the thirteenth cause of action is but another way of asserting that appellant had a common law right of recovery against respondents. As heretofore noted, appellant's right of recovery is not enhanced in any manner by characterizing the existing condition as a nuisance, nor is her right of recovery in any way diminished by labeling the condition a negligent one. We have heretofore held that respondent breached no common law duty owed to appellant, that being an employee of the tenant Noll, she stood in the same position as he did as respondents' lessee.

■ With reference to appellant's argument that the nuisance resulted in part from respondents' failure to observe the numerous ordinances sought to be introduced in evidence, and the cases cited to the effect that nonobservance of an ordinance creates a nuisance, it is sufficient to say that none of the ordinances which appellant claims were violated were received in evidence. Our view, as heretofore expressed, being that the rulings of the court in this regard were correct, it follows that the theory of nuisance cannot be predicated upon the nonobservance of ordinances which were properly excluded from evidence.

■ There is also creditable authority to the effect that an action based upon a private nuisance as that term is known to the law may be maintained only by those whose property rights have been invaded; that while a possessor of land is allowed to recover incidental damages for harms to his person or chattels in an action for private nuisance, the action is not available for the protection of those interests to a person who has no property rights or privileges in land (Vol. 15, Restatement of the Law of Torts, ch. 40, pp. 215, 216-222.).

The case of *Coole* v. *Haskins*, 57 Cal.App.2d 737 [135 P.2d 176], relied upon by appellant, presents no discord with the principle just enunciated, for therein the court says: ''. . . But as we view the complaint, the gist of plaintiffs' causes of action was *an alleged violation by defendants of their duties as owners and possessors of the adjoining property rather than an alleged violation of defendants' duties as lessors.* Under these circumstances, any allegations relating to the relationship of lessors and lessees were superfluous but such allegations did not render the remaining allegations insufficient to show a violation of the duties of defendants as owners and possessors of the adjoining property.'' (Emphasis added.)

The same situation prevails as to the cases of *Spence* v. *Schultz*, 103 Cal. 208 [37 P. 220], and *Colgrove* v. *Smith*, 102 Cal. 220 [36 P. 411, 27 L.R.A. 590], wherein the injuries were attributable to excavations in a public streets which in every sense of the word was a nuisance. An examination of the case of *Boothby* v. *Town of Yreka*, 117 Cal.App. 643 [4 P.2d 589], which appellant asserts is conclusive as to her right of recovery on the theory that the condition existing on the premises and not upon adjacent or adjoining property constituted the nuisance, indicates clearly that the case has no application to the

issues with which we are here confronted. In the Boothby case, the defendant rented a building to the county for the purpose of conducting therein an election to which the voting public of course was to be invited. The court sustained the right of one of the voters to recover for injuries resulting from a dangerous and defective condition of the premises, holding that the rule, that a guest of a tenant has no greater rights against the landlord than the tenant, does not apply where the premises are leased for a public purpose or in order to enable the tenant to invite the public to enter.

This exception to the rule is universally recognized and is pointed out in nearly all of the decisions which we have heretofore cited, and is especially commented upon in *Shotwell* v. *Bloom, supra,* p. 311.

It cannot successfully be contended that this exception to the general rule is at all applicable to the case at bar. Since the leased or demised premises herein were safe structurally or otherwise when demised, respondents, as we have pointed out, owed no duty to the lessee or his employees, when the dangerous condition of the premises, which appellant asserts to be a nuisance, was created by the lessee through operations participated in by his employees.

From what we have herein stated, it follows that the trial court did not err in sustaining objection to the introduction of any testimony by appellant on her thirteenth cause of action, predicated upon the theory of nuisance.

Finally, we come to a consideration of the correctness of the court's ruling that while respondents were guilty of an ordinance violation in that the double doors between the workroom and the showroom opened only inward into the workroom, that the manner in which the doors swung did not have a proximate or any connection with the injuries sustained by appellant, as a result of which the court directed a verdict for respondents.

The ordinance in question (§§ (a) and (d) of ordinance 91.3303 of the city of Los Angeles) reads as follows:

"(a) *Scope.* Every door serving as an exit from an aggregate floor area of more than one thousand square feet (1,000 sq. ft.) shall be constructed and installed in conformity with the requirements of this Section.

. . .

"(d) *Details.* Every door to an exit enclosure shall be self-closing. Doors serving as exits shall open only in the direc-

tion of exit and shall be openable from the inside without the use of a key. Sliding doors and rolling shutters shall not be used on exit doors."

The foregoing provisions of the ordinance were admitted into evidence on the theory that as the door between the workroom and the showroom swung inward toward the workroom, it violated the ordinance and that such ordinance violation would render respondents liable if it retarded appellant's escape from the room, and thereby contributed directly or proximately to the injuries sustained by her.

In determining what if any direct or proximate connection the construction of the double door had with the injuries sustained by appellant, it becomes necessary to set forth a narrative of the pertinent evidence.

Appellant testified that she stopped work on the afternoon of the fire at 5 o'clock or shortly thereafter. She had been working at a table which the photostatic copy of the map received as appellant's Exhibit "1" and attached to her brief, shows was about in the middle of the workroom and near the stairwell at the south wall. Her purse was on a shelf which ran along the south wall, west of the stairwell. She had left her table and was moving over toward her purse at a point which was just about opposite the southwest end of the stairwell when she heard an explosion. The explosion was toward the northeast corner of the room. Immediately there were flames and smoke which instantly spread over the entire room, after which as she testified, "I grabbed my purse off the shelf and then I started—I got down as low as I could and I started to go out and I fell."

"Q. All right. Describe your course as you proceeded toward the door. What happened? A. Well, I went about six feet and I fell and my hands and arms were burned so badly, I had to drop my purse; then I got up and then I started to go towards the—this way (indicating), towards the door, and I fell over someone right there as the doorway.

"Q. At the doorway? A. Yes, sir.

. . .

"Mr. Jackson: Now, I will mark an x at each end of that and I will place some N's on the cross, if that is satisfactory.

"The Court: N-1.

"Mr. Jackson: N-1.

"Q. By Mr. Jackson: Now you say that at some point between the shelving and the door, you fell? A. Yes, sir.

"Q. Will you indicate about where that was, Alma? A. Right—I don't know what is the name of it, but it is just about here (indicating).

"Q. About there? A. Yes.

"Q. I will put an x at that point and mark that N-2."

Appellant went about 6 feet and fell, her hands being so badly burned that she dropped her purse. Her course was traced on the map by a line to the point where she fell, but very soon she got up, but, as she testified, the smoke was "terrific, the flames were all over the place."

Quoting from appellant's direct examination by her counsel as to the doorway, we find the following:

"Q. Now, when you got up there to the doorway which side of the doorway did you stop at. The east side or the west side? A. Why, it would be on the east side.

"Q. On the east side? A. Yes, sir.

"Q. And was the doorway when you got there open or closed? A. When I got there?

"Q. Yes, sir. A. When I got there it was open.

"Q. When you got there it was open? A. I don't remember now let me think, I am confused.

"Mr. Gallagher: May we have the last part of that answer (answer read).

"Mr. Jackson: Well, forget that for a moment. When you got to the doorway what happened? A. Well, I laid there for I don't know how long, something came down and seemed to hit me on my body.

. . .

"Mr. Jackson: Now, Alma, when you got up to the door you say you lay there? A. Yes, sir.

"Q. Where, on the floor? A. Yes, sir.

"Q. Did you fall down when you got to the door? A. I fell over a body at the doorway.

"Q. You fell over what? A. A body at the doorway.

"Q. At the doorway? A. Yes, sir.

"Q. Now, do you know how long you lay there at the bottom of the door? A. No, I haven't any idea.

"Q. Were you conscious at that time? A. Not wholly conscious, no.

"Q. What happened then? Did the door eventually open? A. Yes, sir.

"Q. Do you know who opened it? A. No, I haven't any idea.

"Q. Do you know whether it was opened by someone in the workroom or someone in the other room? A. I don't know.

"Q. You don't know how it opened? A. No, sir.

"Q. Do you know whether it was opened by someone in the workroom or someone in the other room? A. I don't know.

"Q. You don't know how it opened? A. No, sir.

"Q. Well, in any event, when it did open, Alma, then what did you do? A. Well, I staggered to my feet and went out the door and I fell down those steps that lead from the workroom to the showroom.

"Q. Into the showroom? A. Yes, sir.

"Q. And when you got into the showroom did you see anyone in that room? A. Yes, sir, somebody came in; I don't know who he was, and he had something on his face and I don't know who he was."

Regarding appellant's testimony heretofore quoted, that she fell over a body near the door and lay unconscious on the floor, it is asserted in her brief, "that after having lain for sometime at the bottom of the closed door, it was eventually opened, by whom she does not know."

We do not feel that appellant's testimony fairly admits of the construction that the door was opened while she was on the floor or after she fell the second time or that she saw it opened, because she testified positively and unequivocally that when she got to the doorway it was open. It is true that immediately following this testimony she testified:

"Q. When you got there it was open? A. I don't remember now let me think. I am confused."

Thereupon, her examination continued as follows:

"Q. (by Mr. Jackson, appellant's counsel). Well, forget that for a moment. When you got to the doorway what happened?

"A. Well, I laid there for I don't know how long, something came down and seemed to hit me on my body."

After testifying that she did not know how long she lay upon the floor, and that she was not fully conscious, appellant further testified:

"Q. What happened then? Did the door eventually open? A. Yes, sir. . . .

"Q. Well, in any event, when it did open, Alma, then what did you do? A. Well, I staggered to my feet and went out to the door and I fell down those steps that lead from the workroom to the showroom."

We do not regard appellant's statement that she fell over a body near the door as being sufficient to warrant the submission to the jury of the question whether the door delayed her exit in any manner. Appellant admitted that in the prosecution of Mr. Noll she had testified: "I fell over something, I don't know what, and then this plank from up above came down and hit me across the body."

In this regard the state of the evidence, without here narrating it, is such that it would be pure conjecture to assume that there was a person lying on the floor over whom appellant could fall. Thus we see that a verdict based on the premise that some other employee had been unable to escape from the room and thereby obstructed appellant's passage would be pure surmise and conjecture.

Appellant urges that when she testified that at the time she first reached the door, it was open, she "was in a condition of hysteria bordering on frenzy." However, such a contention is not borne out by the record, which we must take as we find it.

The testimony of Mrs. Finnegan, a fellow employee of appellant, was that she was delayed in leaving the room until she got hold of the doorknob. But that she did finally open the door and leave the room ahead of appellant seems undisputed.

Appellant further argues that the testimony of various members of the fire department is to the effect that the door between the workroom and showroom was opened by Captain Wheeler, from which appellant insists, the jury could have inferred that it was his opening this door that afforded appellant an opportunity to escape. To us, however, it seems immaterial whether the door was opened by Fire Department Captain Wheeler, by someone else, or that it remained open after Mrs. Finnegan passed through it. Assuming the door remained closed for some time after Mrs. Finnegan's exit, that fact did not cause the plank to fall on appellant and knock her to the floor, nor did it render her unconscious as she lay upon the floor. If she regained consciousness after the door was opened, it is manifest that the construction of the door and the way it swung had no connection with the burns and injuries sustained by appellant and her testimony is uncontradicted that when she fell she was "practically right there at the doorway." When asked by the court for her recollection as to approximately how far she was from the open doorway when she stumbled to her feet after being

struck by the object, appellant testified, "I imagine about, oh, a foot and a half."

"Q. As it stood open? A. Yes."

We are satisfied from the testimony of appellant herself, uncontradicted by any other witness, the court was warranted in concluding that the appellant was aflame almost instantly following the explosion, and before she could move 6 feet she was so badly burned that she had to drop her purse; as she moved toward the doorway she fell twice, the second time when she was about a foot and a half from the open door— that fall being caused by a plank or some object striking her and knocking her to the floor; she lay on the floor, uncon-scious, for some time, and when she came to, *saw the door open,* and according to her own statement, got to her feet and staggered to the doorway.

It is not only necessary to prove a defendant's negli-gence, but it is a basic element in every right of recovery that a defendant's negligence must contribute to the injury— must be the proximate cause of the injury. Unless, in addi-tion to proving defendant's negligence, such negligence is in some way fastened to the injury, then a case is not made out.

And before a defendant can be held to answer in damages for the injuries suffered by a plaintiff it is incumbent upon the latter to assume the burden of proof and show by a preponderance of the evidence that the negligence of the defendant was the proximate cause of such injuries.

Where the facts go no further than to establish a pos-sibility that defendant's negligence was the proximate cause of the injury, a plaintiff cannot recover (*McKellar* v. *Pender-gast,* 68 Cal.App.2d 485, 490 [156 P.2d 950]; *Puckhaber* v. *Southern Pacific Co.,* 132 Cal. 363, 364, 365 [64 P. 480]; *Bartholomai* v. *Owl Drug Co.,* 42 Cal.App.2d 38, 42 [108 P.2d 36]). As was said by this court in *Dull* v. *Atchison, T. & S. F. Ry. Co.,* 27 Cal.App.2d 473, 476 [81 P.2d 158]:

"While on a motion for a directed verdict all reasonable inferences are to be drawn from the evidence in favor of the plaintiff and conflicts are also to be resolved in favor of the plaintiff, nevertheless, inferences cannot be based on imagina-tion, speculation or supposition."

Where different conclusions may be reasonably drawn by different minds from the same evidence, the decision must be left to the triers of fact. But where as here, it must be said from a review of the evidence, giving full credit only to that portion of the evidence which tends to support the allega-

tions contained in appellant's complaint, indulging in every legitimate inference which may be drawn from that evidence, the determination inevitably follows that there is no evidence of sufficient substantiality to support a verdict in favor of appellant if such verdict were given, under well-established rules and the settled law of this state, we must affirm the judgment herein based upon a verdict directed by the court.

We are persuaded that the situation with which we are here confronted was correctly epitomized by the trial judge in his explanation to the jury at the time he directed the verdict for respondents, and in which explanation he said in part: "In the final analysis, no witness was produced who could testify directly to this fact (that appellant's escape was impeded and her injuries caused or added to by the ordinance violation) but the plaintiff herself. It is to her great credit, though perhaps of little comfort to her, that she testified to the truth without attempting to color it for her own benefit. Not only did she not testify that she had any difficulty in opening the door or that she ever got to the point of trying to open it, but on the contrary she testified not once but ten times that when she reached the door it was open and she went through it.

"In the face of this testimony, neither Court nor jury could possibly make a solemn finding that the manner in which this door swung upon its hinges was a proximate cause of the injuries which this unfortunate plaintiff has suffered or compel the owners of the building to pay therefor."

The foregoing conclusions at which we have arrived render it unnecessary to consider or decide the questions as to whether or not respondent Helbush owed any duty individually to appellant or was liable for any breach of duty on the part of respondent company; whether appellant was guilty of contributory negligence, or assumed the risk of her injuries.

For the reasons herein stated, the judgment is affirmed.

York, P. J., and Doran, J., concurred.

A petition for a rehearing was denied July 26, 1948, and appellant's petition for a hearing by the Supreme Court was denied August 26, 1948. Carter, J., voted for a hearing.