[Civ. No. 25278.   Second Dist., Div. One.   July 31, 1961.]

LYLE KNIGHT, Appellant, v. CONTRACTING ENGI-NEERS COMPANY (a Corporation),[1] Respondent.

[1]Erroneously sued as Contracting Engineering Company. The correct name is Contracting Engineers Company.

436

Magana and Olney and Bruce D. MacLachlan for Appellant.

Sackett & Francoeur, Harry E. Sackett and Henry F. Walker for Respondent.

FOURT, J.—This appeal is by the plaintiff from a judgment in favor of defendant notwithstanding the verdict.

The action is one for damages for personal injury. Plaintiff was an employee of Alta-Frazer Edwards, Inc., (hereinafter referred to as "Alta"), the roofing subcontractor, in the erection of a one-story building.

Plaintiff's "COMPLAINT FOR DAMAGES FOR PERSONAL IN-
JURIES" was filed December 18, 1958. Contracting Engineering
Company, the general contractor, and Does I to XX were
named as defendants. It was alleged that the defendants "so
carelessly and negligently maintained, operated and controlled
the premises in connection with the construction of said build-
ing and so carelessly and negligently furnished or permitted
the use of planks by employees of subcontractors which were
in a dangerous and defective condition, and carelessly and
negligently failed to furnish safe, proper and adequate footing
to plaintiff; that plaintiff while walking across one of the de-
fective planks so supplied by said defendants, fell approxi-
mately twenty (20) feet to the ground below when the same
collapsed."

Defendant, "CONTRACTING ENGINEERS COMPANY, errone-
ously sued herein as CONTRACTING ENGINEERING COMPANY"
filed its "ANSWER" on January 5, 1959. Therein, the above
negligence was denied and contributory negligence on the
part of the plaintiff was pleaded.

The "PRE-TRIAL CONFERENCE ORDER" was filed May 5, 1960.
It incorporated a "JOINT PRE-TRIAL STATEMENT" which set
forth the contentions and issues as follows:

"CONTENTIONS

"The plaintiff contends that the defendant was negligent
in that it furnished and permitted the use of planks by em-
ployees of subcontractors which were in a dangerous and de-
fective condition; and in that it failed to furnish the plaintiff
safe, proper and adequate footing. . . .

"The defendants [sic] contend that the [sic] were not neg-
ligent and that the plaintiff was himself contributorily negli-
gent in that he failed to observe that the board was unsafe
to walk on and that he negligently placed the board in the
position it was in when he fell.

"ISSUES

"1. Negligence of the defendant.
"2. Contributory negligence of the plaintiff.
"3. Proximate cause.
"4. Damages.
"5. Assumption of Risk by plaintiff."

The pretrial order also makes reference to a document en-
titled "DEFENDANT'S SEPARATE STATEMENT OF CONTENTIONS"
which provides in substance that plaintiff without permission,
consent or authority of defendant wrongfully and voluntarily

removed the planks from where they were stacked and placed them across an unfinished part of the roof area; that plaintiff was an experienced iron worker and familiar with customs and practices with respect to walking on iron rather than upon wood; that plaintiff had personal knowledge that the planks were notched, treated and processed for use in the construction of the building and were not to be used for scaffolding; and that plaintiff voluntarily and wrongfully chose to get down from the roof area at a place other than that provided for him and other workmen on the roof, thereby assuming all risk of injury.

On March 20, 1958, defendant was engaged as a general contractor in the erection of a one-story building in the city of Hawthorne. That morning plaintiff was employed by Alta to weld T-bars and he reported to the job site shortly after 9 a. m. A ladder was used to gain access to the roof of the building.

Mr. Bussie, Alta's superintendent, led a crew of three iron-workers, consisting of one Wiley, Knight (the plaintiff) and Murphy, in that order, up the ladder to an iron "I-beam." The ladder was facing east and was located near the third column in from the north wall.

Bussie and Wiley walked north on the iron to the tapered girder and thence east on the tapered girder to where their work was to begin. Plaintiff also walked north on the iron and was approximately 7 or 8 feet away from the latter when Murphy, who was a foreman, reached the top of the ladder and called to plaintiff to help him lay out some Wolmanized (i.e. treated) planks which were north of the ladder adjacent to the I-beam.

The planks were notched with 2-inch notches cut on the side by defendant's carpenters. There was evidence that the planks were owned by defendant. The planks were to be used to form a gutter line and were not intended to support any other structure. Plaintiff's testimony discloses that he knew that the planks were notched and that they were not up there as scaffolding planks.[2] He also testified that he did not notice

---

[2]Plaintiff's testimony during cross-examination is, in pertinent part, as follows:

"Q. You saw that they (i.e. the planks) were all notched, didn't you? A. Yes, they had notches in them.

"Q. And that meant to you they were not to be used for scaffolding, didn't it? A. Not necessarily so.

"Q. Well, you knew they didn't look like boards to be used for

if there were any other planks in the vicinity of the stacked three to five planks; that although he saw some planks in the northwest and southwest sectors of the roof area, they were

scaffolding or catwalk, didn't you? A. Well, it wasn't—that wasn't the specific purpose that they were there for, I knew that.

"Q. Well, again referring to your deposition, page 34, lines 8 through 15:

"'Q. Did you say those planks were painted green? A. As I recall, they were. They had green paint on them but they were unfinished plank.

"'Q. You have seen scaffolding planks before in your experience, haven't you? A. Yes.

"'Q. Did these look like scaffolding planks? A. *No, sir, they didn't.*

"'Q. *And you knew from your experience as an iron worker of 20 years; you knew they were not up there for scaffolding planks, didn't you, Mr. Knight?* A. *Yes, sir.*

"'Q. Now, you had no intention of using them to walk on until Murphy said something to you; isn't that right? A. That's right. Not at that time.'" (Emphasis added.)

Several pages later the Reporter's Transcript discloses that plaintiff testified:

"Q. *You, of course, knew they* (i.e. the planks) *were notched at that time, didn't you?* A. *It was obvious.*

"Q. The fact they were notched meant to you, did it not, Mr. Knight, that they were to be used somewhere in the construction of the building? A. *Yes, it looked as though they were for some definite purpose in the building other than planking for walking on.* . . .

"Q. By Mr. Sackett: *You knew that at the time Murphy asked you to help him lay them out; is that right?* A. *Sure.* I still follow my foreman's orders." (Emphasis added.)

Several pages later the transcript discloses the following testimony of plaintiff:

"Q. . . . [I]n getting around on high places you train yourself to see that upon which you are walking is safe to walk on, don't you? A. Yes, sir.

"Q. And with respect to walking about on the steel that morning, from the time you first got up there until you just walked on this one plank to help Murphy lay the third one down, you walked on the steel to get wherever you went until you started back to go down for coffee, didn't you? A. Yes, sir.

"Q. The reason you did that is you knew the steel was safe to walk on, didn't you? A. It was safe. I knew it wouldn't break or anything. . . .

"Q. By Mr. Sackett: They (i.e. the planks) had been cut and you saw that? A. Yes, sir.

"Q. That indicated to you they were to be used in construction and not for scaffold planks? A. Yes, sir.

"Q. Still you laid them out there and you did not do anything more than just lay them out and give them a glance, did you? A. That's right."

On re-cross-examination plaintiff testified in part as follows:

"Q. But there were notches in them, weren't there? A. Yes, sir.

"Q. And as you have already told us, you knew they were not up there to be used for scaffolding boards. You knew that?

"Mr. MacLachlan: The question has been asked and answered, your Honor.

"Mr. Sackett: I think it is proper in view of the question——

"The Court: Overruled. You may answer, again.

"The Witness: They weren't specifically up there for planking, no, sir.

"Q. By Mr. Sackett: You knew? A. Yes, sir."

some distance away and he could not tell whether they were notched; that he saw no men in the south portion working with any plank; that he never saw either Bussie or Wiley use any plank. There was no evidence that he saw anyone using any plank at any time before the accident, other than Murphy and, of course, himself.

In spite of the knowledge that the planks were notched and not intended as scaffolding, plaintiff assisted Murphy in laying out the planks. Plaintiff and Murphy then walked east on the tapered girder to join Bussie and Wiley. Bussie gave the crew their directions on the spacing and welding of the T-bars and then Bussie left.

Some 15 or 20 minutes later the coffee truck arrived and Bussie yelled, ''Coffee wagon's here.'' Plaintiff and Wiley decided to go down for coffee and walked back along the tapered girder to the third plank with plaintiff in the lead. When plaintiff reached the third plank he turned south and took approximately three steps across the plank when it broke and he fell to the concrete slab 20 feet below. There was evidence that the plank had been cut across its width about half through its thickness.

It had sprinkled the morning of the accident and accordingly, the iron was wet or damp. Bussie testified that he never saw any of the three men walk on any wood; that while the steel was not dry, there was no difficulty in walking on it and that there was no necessity that morning to use any planks or wood to reach the work area. Wiley did not testify. Murphy testified that neither Bussie nor Wiley used any wood but both walked the iron; that Bussie, Wiley, and plaintiff walked the tapered girder and that only he (Murphy) had any trouble because he ''had slippery shoes on'' as a result of which he ''crawled'' on his ''hands and knees'' along the girder. Plaintiff testified that he had no intention of using the planks until Murphy said something to him and that he had no difficulty in walking the iron; that he knew the steel was safe to walk on.

The defendant knew that some of the planks had been sawed half-way through and were located along the K-line. Defendant did not warn plaintiff or any other people not to use the notched planks as scaffolding. Defendant's agent told Bussie that he could use six certain unnotched planks for scaffolding. The record contains no evidence of any express permission to use any notched plank.

The "Subcontract Agreement" between Alta (i.e., the roofing subcontractor) and defendant (i.e. general contractor) provides in pertinent part that the subcontractor was:

". . . [T]o furnish all labor, materials, equipment, including sales and use taxes, supplies and all other things necessary to perform and complete in accordance with the plans and specifications, general conditions and addendas thereto, that portion of the work, generally referred to as construct a poured gypsum roof deck in accordance with plans and specifications in Bulletin No. 1. Time is the essence of this contract and this work will be planned with a coordination of the field operations and the furnishing of a maximum number of workmen and equipment so that this operation can be completed in a minimum of time."

Pursuant to stipulation, no question has been raised on appeal as to the extent of plaintiff's injuries or the amount of the jury's verdict.

The same test governs the power of the trial court to grant a nonsuit, direct a verdict, or render a judgment notwithstanding the verdict. (*In re Estate of Arnold*, 16 Cal. 2d 573, 581 [107 P.2d 25].) What is set forth in 2 Witkin, California Procedure, Trial, section 125, page 1857, is pertinent:

"The . . . (judgment notwithstanding the verdict) may be made only when there is *no substantial conflict in the evidence.* In ruling . . . the court *does not consider credibility of witnesses* but gives to the evidence of the party against whom it is directed *all its legal value,* indulges every legitimate *inference* from such evidence in favor of that party, and *disregards conflicting evidence."*

The trial court has the power to render a judgment notwithstanding the verdict only if, after observing the above test, it determines that there is no substantial evidence to support the verdict. As stated in 2 Witkin, California Procedure, Trial, Section 135, page 1865:

" 'When a motion for a directed verdict, *which should have been granted,* has been denied and a *verdict rendered against the moving party,* the court, at any time before the entry of judgment, . . . on motion of 'the aggrieved party, *shall render judgment in favor of the aggrieved party notwithstanding the verdict.'* (C.C.P. 629.) . . .

". . . C.C.P. 629 permits the judge to promptly correct his judicial error in denying a directed verdict, . . ."

Plaintiff's (appellant's) first contention is that the

defendant expressly or impliedly invited him to use the notched planks as scaffolding. There is no evidence that defendant *expressly* invited plaintiff to use the notched planks as scaffolding.

Plaintiff sets forth some seven items which he contends constitute a basis from which the jury could reasonably have found that the plaintiff was *impliedly* invited to use the planks.

*First,* that "Identical and similar planks were scattered over many parts of the roof." Plaintiff testified to the fact that those used by himself and Murphy were notched and that the other planks seen by him were some distance away so that he did not know whether they were or were not notched. Also, as set forth in footnote 2, *supra,* plaintiff's testimony demonstrated that he knew that the notched planks were not on the roof as scaffolding planks, and that he had this knowledge at the time he helped Murphy lay out the planks.

*Second,* that "Many of the planks had been used and were being used as scaffold planks." The evidence shows that plaintiff was injured the first morning he reported to the job site. There is no evidence that plaintiff saw anyone else (other than himself and Murphy) use any planks as scaffolding. Also, as indicated above, plaintiff knew the planks he used were notched and not on the roof as scaffolding planks.

*Third,* that "The planks used by the plaintiff, as well as all of the other planks on the roof, were of construction grade, the same type as is ordinarily used for scaffold planks." Again, plaintiff is confronted with his own testimony concerning the particular planks used by him.

*Fourth,* that "The planks were not marked so as to prohibit the use, and there was evidence that it is the custom and practice to so mark such planks if the owner does not wish them to be used for scaffolding."

Plaintiff's own testimony as to his knowledge renders defendant's failure to place marks upon the planks so as to indicate they were not to be used as scaffolding as immaterial. There is no duty to tell another that which he already knows. (*Markwell* v. *Swift & Co.,* 126 Cal.App.2d 245, 251 [272 P.2d 47]; *Neuber* v. *Royal Realty Co.,* 86 Cal.App.2d 596, 613 [195 P.2d 501]; *Starck* v. *Pacific Elec. Ry. Co.,* 172 Cal. 277, 282 [156 P. 51, L.R.A. 1916E 58].)

*Fifth,* that "The fact that the iron was wet and that it is common knowledge that wet steel would be more slippery to walk on than wood, tends to show that the wood was there to be used rather than the iron." Again, plaintiff's own testimony

was that he knew the planks were to be used for a purpose other than scaffolding. Also, as set forth in footnote 2, *supra,* plaintiff testified:

"Q. And with respect to walking about on the steel that morning, from the time you first got up there until you just walked on this one plank to help Murphy lay the third one down, you walked on the steel to get wherever you went until you started back to go down for coffee, didn't you? A. Yes, sir.

"Q. The reason you did that is you knew the steel was safe to walk on, didn't you? A. It was safe. I knew it wouldn't break or anything."

Plaintiff further testified that he had no intention of using the planks until Murphy said something to him and that he had no difficulty in walking the steel.

*Sixth,* that "The arrangement and size of the iron was such that it was 'more inviting' to use the wood." See matter set forth under *"Fifth," supra.*

*Seventh,* that "Mr. Bussie, called by the defendant, testified that it is the custom and practice in the building trade to use materials that are designated for one specific purpose for various intermediate purposes . . ." and that "there was nothing unusual about the plaintiff's feeling that there was an implied invitation to use these planks . . ." Plaintiff testified that it was "obvious" to him that these planks were notched; that to him this meant they were not to be used as planking for walking; and that he knew they were not to be used for scaffolding.

Plaintiff asserts in his reply brief that his testimony is subject to at least two interpretations; that the transcript "should be read in light of the fact that it is entirely composed of leading questions posed by an experienced and able trial attorney and directed to a working man with an eighth grade education"; that the testimony could be interpreted to mean *"the planks were there as temporary scaffolding. . . ."* (Emphasis added.)

A careful reading of the testimony negatives this claim. While plaintiff is entitled to have his evidence given all of its legal value and to have favorable inferences drawn therefrom, the inferences must be logical and reasonable.

Plaintiff's next contention is that defendant breached a duty which is owed to plaintiff. ▮▮ The duty of a general contractor to the employee of a subcontractor was summarized in the recent case of *Johnson* v. *Nicholson,* 159 Cal.App.2d 395, 406-407 [324 P.2d 307], as follows:

" 'The general rule is that a general contractor on a construction job who is in control of the premises is burdened with the duty to use ordinary care to provide a safe place for employees of a subcontractor to work, including the duty to warn such employees of a danger, either known to the general contractor, or discoverable by the exercise of ordinary care, or otherwise to protect the employees from injury, and to avoid exposing them to injury on account of dangerous conditions. He is bound to take reasonable measures to protect the employees of a subcontractor from injuries likely to arise from places of danger about the building. If he neglects this duty by failing to give adequate notice or warning of the existence of a place of danger, he may be found liable to an employee of a subcontractor for resulting injury.' (*Revels* v. *Southern Calif. Edison Co.*, 113 Cal.App.2d 673, 678 [248 P.2d 986]; *Raich* v. *Aldon Const. Co.*, 129 Cal.App.2d 278, 284 [276 P.2d 822].)"

An employee of a subcontractor is ordinarily an invitee of the general contractor. (However, see the statement in *Martin* v. *Ideal Packing Co.*, 156 Cal.App.2d 232, 236 [319 P.2d 95].) While the general contractor owes the duty to exercise reasonable care, he is not an insurer of safety. He is not liable for injury to an invitee resulting from a danger which was obvious or should have been observed in the exercise of reasonable care. (*Florez* v. *Groom Development Co.*, 53 Cal.2d 347, 354-355 [348 P.2d 200]; *Pauly* v. *King*, 44 Cal.2d 649, 653 [284 P.2d 487]; *Brown* v. *San Francisco Ball Club, Inc.*, 99 Cal.App.2d 484, 486 [222 P.2d 19].)

Plaintiff's argument is in substance as follows: First, that the defendant, as general contractor, had control of the premises and of the planks thereon. The evidence shows that defendant owned the planks and that the majority of the lumber on the roof was placed there by defendant's own employees. Secondly, that defendant failed to provide a safe place to work; that the iron was wet or damp; that there was no evidence that the defendant advised the men not to walk on the iron or that defendant provided the men with a means of doing their work other than on the steel itself or the wooden planks. Third, that defendant had knowledge of the dangerous condition; that the plank which plaintiff walked upon was sawed half-way through and it broke. There is no question that it was defendant's carpenters who sawed all the planks and that defendant knew that the sawed planks were on the roof. And finally, fourth, that defendant failed to warn

plaintiff of the dangerous condition; that it was the custom and practice for contractors to mark or label material if they did not want others to use it; that none of the planks was so marked; that defendant had expressly given Bussie permission to use some planks for scaffolding but did not warn them not to use the notched lumber for scaffolding purposes.

There is no evidence that defendant expressly authorized any use of the notched planks by the roofing subcontractor (i.e. Alta), or any of its employees; no such permission was secured by or given to plaintiff or Murphy; each testified that he never saw or contacted any of the defendant's people. Each testified that no inquiry was made even of Bussie, his own employer's superintendent-on-the-job, regarding the (or any) planks or for permission to use the same. They simply, as testified by Murphy, took it upon themselves to take these notched planks and lay them out. The evidence shows that defendant general contractor had no control or right of control over plantiff or any other employee of the roofing subcontractor. *Plaintiff* and Murphy *took the three notched planks away from where defendant's carpenters had placed them and laid them out differently, in a manner and for a use which plaintiff himself admittedly knew was not their purpose.* (See footnote 2, *supra*.)

Insofar as defendant's alleged failure to provide a safe place to work because ''the iron was damp or wet'' and that there was no evidence that defendant advised the men not to walk on the steel or provide the men ''with a means of doing their work other than from the steel or the wooden planks,'' plaintiff's own testimony negates the assertion that the place was unsafe. His own testimony demonstrates that he had had no difficulty walking the iron and that it (i.e. the steel) was safe. Only Murphy, because of slippery shoes, had difficulty. Bussie testified that while the steel was not dry, there was no difficulty in walking on it and there was no necessity that morning to use any planks or wood to reach the work area.

While there is no question that defendant ''knew'' that the planks were cut, the evidence is undisputed that it was Murphy and plaintiff who, knowing of the notches which were ''obvious'' and knowing that the planks were not to be used for scaffolding, moved the planks away from the place where the defendant had placed them, and laid them down to use them for scaffolding. The planks became dangerous only when utilized as scaffolding.

As to defendant's failure to warn plaintiff of the dangerous condition of the planks and therefore defendant's failure to tell plaintiff not to use the notched planks, there is no duty to tell or warn another concerning that which he already knows. (See plaintiff's testimony, footnote 2, *supra*.) (*Markwell* v. *Swift & Co., supra,* 126 Cal.App.2d 245, 251; *Neuber* v. *Royal Realty Co., supra,* 86 Cal.App.2d 596, 613; *Starck* v. *Pacific Elec. Ry. Co., supra,* 172 Cal. 277, 282.)

The case of *Florez* v. *Groom Development Co., supra,* 53 Cal. 2d 347 is not, contrary to plaintiff's contention, "for all practical purposes, on all fours with the instant case." The dissimilarity is manifest. In *Florez* the defendant (through its agent) "placed the plank across the ditch at a spot where one end of the plank was leading to and almost directly under the water faucet." The defendant knew that the plank was unsafe to walk on and "that the plank if left in the position in which it was located would constitute an implied invitation to any of the workmen on the job to use it to walk on if they needed water." (53 Cal.2d 347 at p. 355.) In the case at bar, it was Murphy and plaintiff who *removed* the planks from where defendant had stacked them and it was they, and not defendant, who laid out the notched planks and utilized them for scaffolding. Plaintiff had actual knowledge of the fact that the planks were not to be used for scaffolding. In *Florez,* the "dangerous plank was the *only means* furnished to reach that faucet." In the case before us the testimony showed that only Murphy had difficulty in walking the iron and that was because of the shoes he was wearing. The other witnesses, *including plaintiff,* testified that the iron was safe to walk. In other words, plaintiff was not faced with the necessity of having to use a plank which he knew he should not use as scaffolding. He had a safe alternative method to reach the job area—by walking the iron itself.

In *Florez,* the court states that the "jury was entitled to balance the respondent's necessity against the danger, even if it be assumed that it was an apparent one. This was a factual issue." (53 Cal.2d 347 at pp. 358-359.) The evidence in the case at bar negates the element of "necessity" which was present in *Florez.*

We believe that the case of *Scott* v. *Fuller Co.,* 41 Cal.App. 2d 501 [107 P.2d 55] is pertinent in disposing of the case here. In the *Scott* case, plaintiff was an employee of a subcontractor engaged in painting all structural steel which was

not to be encased in concrete. The defendants were the general contractor and its carpenter foreman. The jury returned a verdict for plaintiff and the trial court granted a judgment notwithstanding the verdict. The plaintiff appealed and the judgment notwithstanding verdict was affirmed.

In *Scott* the court proceeded upon the assumption that the joist upon which plaintiff was standing gave way under him causing him to fall. Like the case at bar, there was no necessity for plaintiff to have used the particular forms as scaffolding. The joists were not put up for the purpose for which plaintiff was using them. In the case at bar, the planks were not placed on the roof to be used as scaffolding. In each case the plaintiff had knowledge that the particular item utilized was not there for the purpose for which the plaintiffs used them. (In *Scott,* the defendants told plaintiff not to use joists while in the case at bar plaintiff was not so told, but testified that he knew they were not there as scaffolding.) The element of ''invitation to use'' was missing in both cases.

For the foregoing reasons the judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied August 25, 1961, and appellant's petition for a hearing by the Supreme Court was denied September 20, 1961. Peters, J., and White, J., were of the opinion that the petition should be granted.