[Civ. No. 22740. First Dist., Div. One. Jan. 23, 1968.]

VERA LYSICK et al., Plaintiffs and Appellants, v. LEO J. WALCOM, Defendant and Respondent.

Barbagelata, Zief & Carmazzi and Robert D. Barbagelata for Plaintiffs and Appellants.

Richard A. Boyd and Cyril Viadro for Defendant and Respondent.

MOLINARI, P. J.—In this action for damages for defendant's alleged bad faith and negligence in the performance of his duties as an attorney at law, plaintiffs appeal from the judgment entered upon a jury verdict in favor of defendant and from the order of the trial court denying plaintiffs' motion for judgment notwithstanding the verdict. Plaintiffs' contentions on appeal are that (1) the evidence is insufficient to support the verdict and therefore the trial court should have granted plaintiffs' motion for judgment notwithstanding the verdict; and (2) the trial court erred in instructing the jury that they were entitled to reject the opinions of the experts who testified on plaintiffs' behalf.

*The Record*

On December 16, 1956, as a result of a collision between an automobile driven by Bernard L. Rardin and one driven by Vitaly Lysick, said drivers and Alexander Lysick, Vitaly's

passenger at the time of the accident, were all killed. At the time of this accident Rardin carried a policy of public liability insurance with Allstate Insurance Company, the limits of which policy were $5,000 for bodily injury to any one person and $10,000 for all bodily injury arising out of a single accident.

Following the accident, plaintiffs, Vera and Vladimar Lysick, the widow and son, respectively, of Vitaly Lysick, and Tatiana Lysick, the widow of Alexander Lysick, through their attorney, Henry Broderick, commenced negotiations with Allstate through one of its claims examiners, Samuel McGeachy, in an effort to secure Allstate's payment to plaintiffs of the $10,000 coverage available under the Rardin policy as damages for the death of their decedents. These negotiations led in January 1957 to an offer on the part of Allstate to settle plaintiffs' claims for $9,500, which offer was rejected by Broderick. Thereafter, on June 12, 1957, by letter from Broderick to the administrator of Rardin's estate, which was being probated in West Virginia, plaintiffs set forth their claims aggregating $450,000 against the estate of Rardin and offered to settle these claims for a total of $12,500. In this letter plaintiffs stated that the settlement offer would expire on July 15, 1957, whereupon suit would be filed against the estate.

Thereafter, on June 19, 1957, J. B. Heilmann, the attorney for Rardin's estate, wrote McGeachy, advising him of plaintiffs' claims and settlement offer[1] and demanding of Allstate that it settle plaintiffs' claims to protect the estate from the threatened $450,000 action.[2] Receipt of this letter was merely acknowledged by Allstate because, according to the Allstate inter-office memorandum concerning the letter, Allstate was "reluctant to jump into settlement with claimant counsel at this point." On July 10, 1957 Heilmann wrote another letter to McGeachy, again demanding that plaintiffs' claims be settled, expressing the willingness of the estate to contribute the $2,500 over and above the limits of Rardin's policy with Allstate, and further notifying McGeachy that the estate would hold Allstate liable for any judgment in favor of plaintiffs in excess of the $12,500 settlement offer. In response to

---

[1] Actually Allstate was already aware of plaintiff's claims and settlement offer, having received a copy of Broderick's letter to Everett Rardin.

[2] Prior to June 19, 1957 Heilmann had had some correspondence with Allstate in which Heilmann asked to be kept informed concerning settlement negotiations with plaintiffs and requested especially that plaintiffs' claims be settled.

this letter McGeachy wrote Heilmann on July 19, 1957, advising him that Allstate had made a settlement offer which Broderick had rejected and requesting him to forward to Allstate the expected suit papers. This request was complied with by Heilmann on July 23, 1957, following his receipt of the complaint which plaintiffs had filed in California on July 15, 1957, naming the administrator of Rardin's estate as the defendant in a wrongful death action. At the same time Heilmann again demanded of McGeachy that Allstate settle plaintiffs' claims.

On August 9, 1957, following McGeachy's receipt of the suit papers concerning the litigation between plaintiffs and the estate of Rardin, McGeachy, on behalf of Allstate, retained defendant to represent the estate in that action.[3] At that time McGeachy informed defendant that Allstate had accepted the case as one of liability and accordingly authorized defendant to pay up to $9,500 on behalf of Allstate in settlement of the case. In addition, McGeachy sent defendant the following documents: the file which had been prepared by Allstate in relation to the accident between plaintiffs and Rardin, McGeachy's copy of the June 12, 1957 letter from Broderick to Heilmann offering to settle the case for $12,500, and the letters of June 19, July 10, and July 23, 1957 from Heilmann to Allstate in which Heilmann demanded that Allstate pay the full $10,000 coverage under its policy with Rardin in settlement of the case. Thereafter, on August 20, 1957 defendant's associate, John Harmon, advised Broderick that the $9,500 settlement offer from Allstate was still open. Broderick, however, again rejected this offer summarily. Accordingly, on August 21, 1957, defendant filed an answer to plaintiffs' complaint.

Thereafter, on August 29, 1957, defendant received a letter from McGeachy advising him that he could use $10,000 to settle the cases if he felt it was ''wise and expedient to do so.''[4] Because defendant was uncertain as to whether this letter in fact gave him authority to pay plaintiffs $10,000, defendant thereupon telephoned McGeachy for a clarification of Allstate's position as to settlement of plaintiffs' claims. In this conversation, according to defendant's testimony, McGeachy

---

[3]According to the terms of Allstate's policy with Bernard Rardin, Allstate agreed to defend any suit against Rardin involving personal injuries arising out of Rardin's use of an automobile.

[4]The letter in its entirety reads as follows:
''Dear Mr. Walcom:
''Upon reviewing this file and my letter of instructions to you, it

told defendant that the limits of Rardin's policy with Allstate were not to be paid to plaintiffs at this time, but that defendant could offer the full $10,000 at a "propitious moment."

Heilmann, in the meantime, was in correspondence with Broderick regarding the status of the wrongful death action and on October 15, 1957 reiterated, on behalf of the estate, that "We stand ready now or at any time to pay the sum that we agreed upon by telephone and which I confirmed by letter."

In November 1957 defendant and McGeachy again exchanged correspondence, McGeachy asking defendant if Broderick had "cooled down sufficiently now to be reasonable about the matter and close it out" and defendant replying that he had not and that defendant could "guarantee . . . that there will be an insistence that the full policy be paid." On December 30, 1957 Everett C. Rardin, the administrator of the estate of Rardin, died, and thereafter an administrator *de bonis non* was appointed in his place. On February 5, 1958 Heilmann was advised for the first time, by letter from McGeachy, that defendant had been retained to defend the wrongful death action and was seeking to settle the suit and that Heilmann would be advised when a settlement was achieved.

A pretrial conference in the wrongful death action between plaintiffs and the estate of Rardin was held on September 11, 1958. At that time Harmon represented to the court that his authority was limited to a settlement offer of $9,500 on behalf of Allstate, whereupon trial was set for September 29, 1958.

Thereafter, a letter from Harmon to McGeachy dated September 17, 1958 and one from McGeachy to defendant dated September 16, 1958 crossed in the mail. In Harmon's letter he informed McGeachy that the pretrial conference had been held, stated that plaintiffs would not settle for anything less than $10,000, and concluded by stating, "There is no doubt but what we will have to pay the full amount in this

---

appears that I may be asking too much, that you protect us fully and use no more than $9500.

"We don't expect the impossible and I should have made it clear that you may use $10,000 to settle these two cases if under all the circumstances you feel it is wise and expedient to do so. I do not wish to indicate that you should throw in the full amount immediately, but rather I want you to know that your hands are not tied to the figure that I mentioned in my letter of August 9th, 1957.

"Sincerely yours,
"S. P. McGeachy."

case, but we do not intend to offer it until the very last minute.'' In McGeachy's letter he informed defendant that he (McGeachy) ''would be willing to offer $10,000 at this time'' and suggested that defendant make a firm tender of settlement. This Harmon did by letter to Broderick on September 18, 1958. However, in response to this offer Broderick informed Harmon that he (Broderick) would settle only for $12,500 and that Harmon should contact the estate and obtain $2,500 and then send Broderick the appropriate release and dismissals. Thereupon, Harmon wrote a letter to Heilmann on September 23, 1958 in which, after informing the latter that Harmon's office had been retained by Allstate to represent the estate of Rardin in the lawsuit instituted by plaintiffs, Harmon stated that his office had offered plaintiffs $10,000 as settlement of the case but that plaintiffs had not yet indicated whether they would accept such offer. This letter was followed by a wire dated September 26, 1958 from defendant to Heilmann inquiring whether the estate wished to offer anything in addition to the $10,000 which Allstate would offer. In response to this wire Heilmann informed defendant by wire on September 27, 1958 that since Everett Rardin's death the estate was both unable and unwilling to contribute to the settlement, and that the only asset in the estate was an undivided interest in real estate, appraised at $3,000, which was being litigated by the heirs.

A settlement not having materialized, the wrongful death action went to trial by the court on September 29 and 30, 1958 and resulted in a judgment in favor of plaintiffs in the sum of $225,000. Thereafter, on October 2, 1959, after Allstate paid plaintiffs $10,684.75 toward partial satisfaction of the judgment against the estate of Rardin and after plaintiffs had obtained an assignment from the estate of Rardin for any cause of action which the estate might have against Allstate and defendant as a result of the entry of judgment against the estate of Rardin in the wrongful death action, plaintiffs instituted the instant action against Allstate and defendant. In this action plaintiffs sought damages for Allstate's and defendant's alleged bad faith in refusing to settle plaintiffs' claims against the estate of Rardin and further sought damages against defendant for his alleged negligence in representing the estate of Rardin in the wrongful death action. Prior to trial plaintiffs compromised their claims as against Allstate for $89,000. Accordingly, the instant action was dismissed with prejudice as against Allstate and

proceeded to trial solely against defendant in whose favor a jury verdict was ultimately returned.

It should be noted here that at the trial of the instant action Heilmann testified, in explanation of his telegram of September, 27, 1958 to defendant that the estate was unable and unwilling to contribute to the settlement, that Everett Rardin, the administrator of the estate, had received $2,000 as beneficiary of a life insurance policy on the life of Bernard Rardin, which sum Everett was willing to apply on the $2,500 portion of the settlement agreed to be paid by the estate, but that said sum was not available after Everett's death to be applied toward the settlement.

Pertinent evidence in addition to the foregoing will later appear in connection with the discussion of specific issues.

### The Motion for Judgment Notwithstanding the Verdict

In considering plaintiffs' first contention relating to the failure of the trial court to grant their motion for a judgment notwithstanding the verdict, we must be mindful that the granting of such a judgment, like a nonsuit or directed verdict, is only proper when there is no evidence of sufficient substantiality to support the verdict. (*McFarland* v. *Voorheis-Trindle Co.*, 52 Cal.2d 698, 703 [343 P.2d 923]; *Hergenrether* v. *East*, 61 Cal.2d 440, 442 [39 Cal.Rptr. 4, 393 P.2d 164]; *Knight* v. *Contracting Engineers Co.*, 194 Cal.App.2d 435, 442 [15 Cal.Rptr. 194].) In making this determination the court does not consider credibility of witnesses, but gives to the evidence of the party against whom the motion is directed all its legal value, indulges in every legitimate inference from such evidence in favor of that party, and disregards conflicting evidence. (*Knight* v. *Contracting Engineers Co., supra; Estate of Lances*, 216 Cal. 397, 400 [14 P.2d 768]; *McFarland* v. *Voorheis-Trindle Co., supra*; 2 Witkin, Cal. Procedure (1954) Trial, §§ 125, 135.)

In the light of these principles we proceed to consider plaintiff's basic contention that there is no substantial evidence supporting a verdict for defendant because, as a matter of law, the only reasonable conclusion that can be legally deduced from the evidence is that defendant acted negligently and in bad faith and thus breached his duty to his client, the estate of Rardin, and that this breach of duty resulted in the entry of the excess judgment against the estate. Specifically, plaintiffs rely on the fact that although Allstate gave defendant authority to offer plaintiffs the full $10,000 limits of the

Rardin policy as of August 29, 1957, defendant withheld an offer in this amount from plaintiffs until September 18, 1958. Defendant, in turn, maintains that the questions as to whether he breached any duty to the estate and whether such breach was the proximate cause of the excess judgment were questions of fact, the resolution of which in defendant's favor cannot be disturbed on appeal.

## Defendant's Duty

In the instant case liability is sought to be fastened upon defendant both for negligence and breach of the duty to act in good faith, irrespective of negligence.[5] In delineating defendant's duty to the estate we must first inquire into the nature of the relationship between them. In this regard we note that it is conceded that defendant was employed by Allstate to defend the estate in the wrongful death action by virtue of the terms of the automobile insurance policy which Allstate had issued to Rardin. Under the terms of that policy Allstate was authorized to make such settlement of any claim or suit against the insured as Allstate deemed expedient, and the insured was obligated to assist in effecting settlements.

Ordinarily, there is no conflict of interest involved in such a situation because the insertion in the policy of a provision requiring the insured to permit the insurance company's lawyer to defend claims insured against amounts to a consent in advance by the insured to the employment of an attorney by the insurance company to defend such claims. (Drinker, Legal Ethics, pp. 114-115.) Accordingly, in such cases the attorney represents two clients, the insured and the insurer, and he owes to both a high duty of care imposed by statute (Bus. & Prof. Code, § 6068) and the rules governing professional conduct. (Rules of Prof. Conduct, 52 Cal.2d 893-899; see *Ivy* v. *Pacific Auto. Ins. Co.*, 156 Cal.App.2d 652, 659 [320 P.2d 140].) Insofar as the insured is concerned the attorney owes him the same obligations of good faith and fidelity as if he had retained the attorney personally. (*Crum* v. *Anchor Cas. Co.*, 264 Minn. 378 [119 N.W.2d 703, 712]; *American Employers Ins. Co.* v. *Goble Aircraft Specialties*, 205 Misc. 1066 [131 N.Y.S.2d 393, 401]; *Allstate Ins. Co.* v. *Keller*, 17 Ill. App.2d 44 [149 N.E.2d 482, 486, 70 A.L.R.2d 1190].)

It sometimes happens, while such attorney is repre-

[5]We note that in the instant case the trial court instructed that defendant was liable to the insured if he was guilty of bad faith *or* if he was negligent, and such bad faith or negligence was a proximate cause of damage to the estate.

senting both the insured and the insurer, that a conflict of interest arises between his two clients. A conflict of interest between his two clients, however, does not necessarily require that the attorney withdraw from the case or that he terminate the relationship of attorney and client with the client whose interests would prevent the attorney from devoting his entire energies in that client's behalf and to that client's interests, although he may choose to do so. ■ In California, an attorney may usually, under minimum standards of professional ethics, represent dual interests as long as full consent and full disclosure occur.[6] (Rules 6 and 7, Rules of Prof. Conduct; *Ishmael* v. *Millington*, 241 Cal.App.2d 520, 526 [50 Cal.Rptr. 592]; *Grove* v. *Grove Valve & Regulator Co.*, 213 Cal.App.2d 646, 652-653 [29 Cal.Rptr. 150]; *Lessing* v. *Gibbons*, 6 Cal.App.2d 598, 606 [45 P.2d 258]; see Keeton, *Liability Insurance and Responsibility for Settlement* (1954) 67 Harv. L.Rev. 1136, 1169-1171.)

■ In *Lucas* v. *Hamm*, 56 Cal.2d 583, 591 [15 Cal.Rptr. 821, 364 P.2d 685], it was held that an attorney, by accepting employment to render legal services, impliedly agrees to use such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and he may be liable for damage resulting from failure to do so. This liability may be based on tort or breach of contract, but in either case the liability of an attorney for failure to properly perform his duties is governed by the general standard of care described in *Lucas, supra*. (See *Lucas* v. *Hamm, supra*.)

Where an attorney represents two clients with divergent or conflicting interests in the same subject matter, the *Lucas* rule demands that the attorney must disclose all facts and circumstances which, in the judgment of a lawyer of ordinary skill and capacity, are necessary to enable his client to make free and intelligent decisions regarding the subject matter of the representation. (*Ishmael* v. *Millington, supra*, 241 Cal.App.2d at p. 528; *Anderson* v. *Eaton, supra*, 211 Cal. at p. 116; *All-*

---

[6] A number of cases have held that counsel should terminate a relationship when the discharge of duty to one client conflicts with the duty to another. (*Dettamanti* v. *Lompoc Union School Dist.*, 143 Cal.App.2d 715, 723 [300 P.2d 78]; *Hammett* v. *McIntyre*, 114 Cal.App.2d 148, 153-154 [249 P.2d 885]; *McClure* v. *Donovan*, 82 Cal.App.2d 664, 666 [186 P.2d 718]; *Pennix* v. *Winton*, 61 Cal.App.2d 761, 773 [143 P.2d 940, 145 P.2d 561]; see *Anderson* v. *Eaton*, 211 Cal. 113, 116 [293 P. 788].) These cases appear to so hold without regard to rules 6 and 7 of the California Rules of Professional Conduct approved by the Supreme Court, which rules permit representation of adverse interests after disclosure of the relation (rule 6) and with the clients' consent (rule 7).

148

*state Ins. Co..* v. *Keller, supra,* 149 N.E.2d at p. 486.). Accordingly, when an attorney attempts dual relationship without making the full disclosure required of him, he is civilly liable to the client who suffers loss caused by lack of disclosure. (*Ishmael* v. *Millington, supra,* at p. 527; *Johnston* v. *Andrade* (Tex. Civ. App.) 54 S.W.2d 1029, 1031; *Olitkowski* v. *St. Casimir's Sav. & Loan Assn.,* 302 Mich. 303 [4 N.W.2d 664, 668].)

 Plaintiffs urge that there is still another duty imposed upon an attorney in a case such as the instant one, that is, where an attorney represents both the insured and the insurance company and a conflict of interest arises between his two clients in connection with offers of settlement, there is imposed upon the attorney the same obligation of fair dealing and the duty to act in good faith as rests upon the insurance company. Essentially, plaintiffs rely upon the liability imposed upon an insurance company when it unwarrantedly refuses an offered settlement where the most reasonable manner of disposing of the claim is by accepting the settlement. Such liability is based upon bad faith and not upon negligence (*Brown* v. *Guarantee Ins. Co.,* 155 Cal.App.2d 679, 683 [319 P.2d 69]; *Ivy* v. *Pacific Auto. Ins. Co., supra,* 156 Cal. App.2d at p. 659; *Palmer* v. *Financial Indem. Co.,* 215 Cal. App.2d 419, 427-429 [30 Cal.Rptr. 204]), and is predicated upon the following rule: In every policy of insurance "there is an implied covenant of good faith and fair dealing that neither party will do anything which will injure the right of the other to receive the benefits of the agreement"; this covenant requires the insurer to settle claims without litigation in an appropriate case although the express terms of the policy do not impose the duty; "that in determining whether to settle the insurer must give the interests of the insured at least as much consideration as it gives its own interests; and that when 'there is great risk of recovery beyond the policy limits so that the most reasonable manner of disposing of the claim is a settlement which can be made within those limits, a consideration in good faith of the insured's interest requires the insurer to settle the claim.' " (*Crisci* v. *Security Ins. Co.,* 66 Cal.2d 425, 429 [58 Cal.Rptr. 13, 426 P.2d 173]; *Comunale* v. *Traders & General Ins. Co.,* 50 Cal.2d 654, 658-659 [328 P.2d 198. 68 A.L.R.2d 883]; see also *Critz* v. *Farmers Ins. Group,* 230 Cal.App.2d 788, 793-794 [41 Cal.Rptr. 401, 12 A.L.R.3d 1142]; *Palmer* v. *Financial Indem. Co., supra,* at pp. 427-429; *Davy* v. *Public Nat. Ins. Co.,* 181 Cal.App.2d 387, 394-396 [5 Cal.Rptr. 488].)

It is apparent that the foregoing rule is one that applies to the insurance company and the insured, and not to the attorney for either of them, since it finds its genesis in the contractual relationship between the insurer and the insured which gives rise to the implied covenant imposing the duty described by the rule. Although it has been stated that ''The obligation of fair dealing and the duty to act in good faith rest equally upon the insurance company and the attorney'' (*Ivy* v. *Pacific Auto. Ins. Co., supra,* 156 Cal.App.2d at p. 663), the attorney's obligation and duty is equated with and must be read in the context of the general standard of professional care described in *Lucas* and *Ishmael.* That degree of care is related to the specific situation in which the attorney finds himself and the standard is that of ordinary care under the circumstances of the particular case governed by the established standards of professional ethics which have as their guideposts the elements of good faith and fidelity to his client. (See *Ishmael* v. *Millington, supra,* 241 Cal.App.2d at p. 526; *Cucinella* v. *Weston Biscuit Co.,* 42 Cal.2d 71, 80 [265 P.2d 513].)

We are of the opinion that the above quoted language from *Ivy* is consistent with the principles we have discussed. There the attorney acting for both the insurance company and the insured *stipulated* to a judgment in excess of the policy limits *without the knowledge and consent* of his client, the insured, and for the benefit of his other client, the insurance company. This was held to be a breach of the duty the attorney owed the insured on the basis that the attorney had no legal right to stipulate away the insured's rights without his consent. Accordingly, the essence of the holding in Ivy, insofar as the attorney was concerned, is that because the attorney's active conduct prejudicially affected the insured's substantive rights his breach of duty to the insured amounted to legal malpractice.

It is important to note here that where an attorney is employed to represent both the insurance company and the insured his duty is commensurate with the extent of his employment. He may be employed with respect to all matters associated with the claim, or he may be employed solely for the defense in court. Professor Keeton (*Liability Insurance and Responsibility for Settlement, supra,* 67 Harv. L.Rev. at pp. 1167-1171), noting that the task of representing both the insured and the insurance company is an impossible task, suggests that the parties may create a relationship under which

the attorney has no duty to the insured in the matter of settlement. In such a situation, Keeton points out that the settlement decision has no significance between the insured and the attorney who is representing the defense in court. It is essential in such case, however, that the parties clearly understand that the client-attorney relationship does not extend to the matter of settlement, and if circumstances indicate that the insured may be misled, the attorney has the duty to make it clear to the insured that he represents only the company with respect to settlement. (See Keeton, *supra*.)

Accordingly, where the attorney properly represents only the insurance company in the matter of settlement, it is his duty to protect the interests of the insurance company in that respect including protection against liability for failure to discharge its duties to the insured. In such a situation, if the attorney fails to give proper consideration to the interests of the insured in his recommendations with respect to the settlement of the case and the insurance company acts upon that recommendation causing loss to the insured, there is no cause of action against the attorney because he owes no duty in that respect to the insured. In that case the insured's cause of action is only against the insurance company. (See Keeton, *supra*.)

### Breach of Duty

Our next inquiry is whether defendant breached his duty to his client, the estate. Breach of duty is usually a fact issue for the jury, but it may be resolved as a matter of law if the circumstances do not permit a reasonable doubt as to whether the defendant's conduct violates the degree of care exacted of him. (*Ishmael* v. *Millington, supra,* 241 Cal.App.2d at p. 525; *Warner* v. *Santa Catalina Island Co.*, 44 Cal.2d 310, 318 [282 P.2d 12]; *Mosley* v. *Arden Farms Co.*, 26 Cal.2d 213, 217 [157 P.2d 372, 158 A.L.R. 872].) Accordingly, we analyze defendant's conduct in the light of this principle.

When defendant was retained by Allstate to defend the wrongful death action in August 1957, Allstate turned over to him its file concerning the accident and its correspondence with counsel for plaintiffs and the estate. Moreover, at that time Allstate advised defendant that the case was one of liability and authorized him to pay up to $9,500 on behalf of Allstate in settlement of the case. At this time defendant became aware of a conflict of interest between his two clients concerning the settlement offer made by plaintiffs. He could have then terminated his relationship to the estate, but chose

to continue to act as attorney for both clients. Accordingly, by so continuing to act, he impliedly agreed to use such skill, prudence and diligence in the representation of the estate as lawyers of ordinary skill and capacity commonly possess in the performance of like tasks. Moreover, since he was representing two parties with divergent interests, insofar as the settlement of the case was concerned, defendant labored under the duty of disclosing all facts and circumstances which, in the judgment of a lawyer of ordinary skill and capacity, were necessary to enable each of his clients to make free and intelligent decisions regarding the subject matter of the representation. ▮▮▮ In this regard we note that at no time did defendant advise the estate that he was acting solely for the insurance company in the matter of settlement. Accordingly, since defendant was employed in all matters associated with plaintiffs' claim, and since he did not advise or make it clear to the estate that he was representing only the insurance company in the advisability of settlement, his duty likewise extended to the representation of the estate in that respect. This duty, therefore, included the obligation to attempt to effectuate a reasonable settlement of the wrongful death action where the general standards of professional care exacted of him required that the most reasonable manner of disposing of the action was by settlement.

▮▮▮ The uncontradicted facts in the present case can lead a reasonable man to conclude only that defendant acted solely upon practical considerations in the interests of Allstate and considered his duties to the insurance company paramount to his duties to the estate. By continuing to act as counsel for the estate, while entertaining the belief that his primary obligation in the matter of settlement was to the insurer, defendant violated the legal and ethical concepts which delineated his duties to the estate.

At the time defendant was retained by Allstate he was advised that the case was accepted by it as one of liability and was authorized by Allstate to settle the case on behalf of Allstate for the sum of $9,500. Defendant, as he was duty bound to do, did not communicate this information to the insured so that it could have acted upon this information and been in a position to make an intelligent decision regarding defendant's representation. Instead, on August 20, 1957, defendant, through Harmon, advised plaintiffs' counsel that the $9,500 offer was still open, and when the offer was rejected summarily defendant filed an answer to plaintiffs'

complaint. Neither the offer to settle nor its rejection. was disclosed to the insured.

The awkward situation in which defendant thereby permitted himself to be placed was further accentuated when he received the letter from McGeachy on August 29, 1957, advising defendant that he was authorized to settle plaintiffs' claims on behalf of Allstate for $10,000, the full policy limit, if he felt it "wise and expedient to do so," and the telephonic advice from McGeachy shortly thereafter that the $10,000 was not to be paid at that time, but that defendant could offer the full $10,000 at a "propitious moment." Since the case was one of conceded liability in a situation which clearly indicated a great risk of recovery beyond the policy limits, there can be little doubt that this was the "propitious moment" for defendant, in the light of the fidelity he owed both clients, to demand, on behalf of the insured, and to advise and urge, as Allstate's attorney, that Allstate contribute forthwith the full $10,000 towards the settlement and to disclose this advice to the estate so that it could have intelligently acted upon this information. Defendant did not follow these appropriate courses of action, but instead continued to act solely in Allstate's interest to save $500.

No effort, moreover, was made by defendant to settle the case on behalf of the insured until September 26, 1958 when he inquired whether the estate wished to offer anything in addition to the $10,000. This communication followed his wire of September 23, 1958 when defendant, for the *first time,* communicated with his client, the estate, in which communication he informed the estate that he had been retained by Allstate to represent the estate in the lawsuit filed by plaintiffs and that he had offered plaintiffs $10,000 on behalf of Allstate in settlement of their claims against the estate. This communication was made approximately six days before the wrongful death action went to trial.

Defendant's paramount persistence in the welfare of Allstate is also indicated by his failure to disclose the following material facts to the estate: his "guarantee" to Allstate in November 1957 that "there will be an insistence that the full policy be paid"; his representations at the pretrial conference in September 1958 that his authority was limited to a settlement of $9,500 on behalf of Allstate; and his advice to McGeachy, following the pretrial conference, that "There is no doubt but what we will have to pay the full amount in this case, but we do not intend to offer it until the very last minute."

In the light of defendant's duty to the insured, we hold that as a matter of law defendant's conduct under the circumstances of the particular case violated the general standards of professional care which required him to use such skill, prudence and diligence in the settlement of the claim against the estate as lawyers of ordinary skill and capacity would have commonly used in the performance of like tasks.

### Causation

The question remains whether defendant's breach of duty was a proximate cause of damage to the estate, that is, whether there was causation in fact upon which loss to the estate could be predicated. Causality is normally a fact issue for the jury except in those cases where reasonable men cannot differ. (*Ishmael* v. *Millington, supra,* 241 Cal. App.2d at pp. 525-526; *Basin Oil Co.* v. *Baash Ross Tool Co.,* 125 Cal.App.2d 578, 603 [271 P.2d 122]; Prosser, *Proximate Cause in California* (1950) 38 Cal.L.Rev. 369, 375-383.) The instances in which causation in fact is held to be established as a matter of law are rare because by its very nature causation is a fact; it is something without which the event would not have occurred. (See Prosser, *supra.*) Accordingly, the question to be determined ordinarily "becomes one of what would have happened if the defendant had acted otherwise" (Prosser, *supra,* p. 382), and is "one on which any layman is quite as competent to pass judgment as the most learned court." (Prosser, *supra,* p. 375.) In the light of these principles, therefore, causation in California has turned on the sufficiency of the evidence to establish this fact, the burden of proof being on the plaintiff to establish "a reasonable basis for the conclusion that it was more likely than not that the conduct of the defendant was a substantial factor in the result." (Prosser, *supra,* p. 381; see cases there cited.)[7]

 In the instant case we have concluded that causation was a jury question which could not be resolved as a matter of law; that there was evidence of sufficient substantiality from which the jury could determine that defendant's conduct, even though it constituted a breach of duty to the insured, was not a proximate cause of the damage which was

[7]It should be noted here that where there is causation in fact it need not be the sole proximate cause. Accordingly, an attorney's breach of duty need not be the sole cause of the client's loss. (*Modica* v. *Crist,* 129 Cal.App.2d 144, 146 [276 P.2d 614]; *Ishmael* v. *Millington, supra,* 241 Cal.App.2d at p. 529; see Prosser, *supra,* p. 378.)

caused to plaintiffs by reason of the failure of Allstate to settle within the policy limits; and that there was evidence of sufficient substantiality from which the jury could determine that the sole proximate cause of plaintiffs' loss was the breach of the duty of good faith upon the part of Allstate.

Under the circumstances of the present case the jury could have concluded from the evidence that defendant's breach of duty was not a substantial factor in the result, and that if defendant had acted commensurate with the high duties he owed the insured the result would have been the same. The evidence is susceptible of the inference that defendant had in fact recommended to Allstate that it pay the full amount of its policy limits, but the company was resistent to the suggestion and did not authorize defendant, as its agent and attorney, to offer plaintiffs the full $10,000 until September 16, 1958; and further that even if defendant had made a full disclosure to the estate prior to that time it would only have been informed of what it already knew, that is, that the insurance company was unwilling to settle for its full policy limits. In this last regard, while the record is unclear whether the insured knew that Allstate was willing to contribute $9,500 to the settlement, the evidence is such that the jury could have inferred that this was made known to Heilmann by Broderick in view of the many communications between them discussing the claim and Allstate's recalcitrance. Moreover, the state of the record is such that the jury could clearly draw the inference that the estate had no funds available for settlement after December 30, 1957, the date of Everett Rardin's death, and that any offer to pay the full $10,000 policy limit after that date would have been futile. As pointed out above, whether defendant had authority to settle for said amount on behalf of Allstate between August 9, 1957, when defendant was employed, and December 30, 1957 was susceptible of the inference that such authority was withheld during that period.

In reaching this conclusion we are not unmindful of defendant's testimony that he had the discretion to offer plaintiffs the $10,000 ''other than immediately.'' The effect, value and weight of this testimony, however, was for the jury's determination in view of defendant's testimony that McGeachy did not want to pay the $10,000 ''immediately'' and that ''in one breath he was giving me the discretionary authority—in the next he wasn't.'' The jury, moreover, was entitled to reconcile this testimony with McGeachy's equivo-

cal letter of August 29, 1957, his letter of September 16, 1958 that he "would be willing to offer $10,000 at this time," and McGeachy's testimony that he "wanted to save $500" and didn't want to pay the $10,000 until he had to, and his testimony that as late as January 1958 he didn't want defendant to pay the $10,000 "unless he would be charging me more law costs for holding out."

### Alleged Errors in Instructing the Jury

▊ Two local practicing trial attorneys were called as witnesses by plaintiffs. To each, plaintiffs' attorney propounded a hypothetical question containing many of the facts adduced in the instant case. At the conclusion of the recitation of facts, plaintiffs' attorney asked each attorney for his opinion as to whether the attorney referred to in the hypothetical question "used such skill, prudence and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake?" In response to this question each attorney testified that such attorney referred to in the hypothetical question did not follow the standard of care and further gave his opinion as to what steps such attorney should have taken under the circumstances referred to in the hypothetical question.

In instructing the jury the trial court first instructed with respect to expert witnesses in the form of BAJI Instruction No. 33 describing the nature of expert opinion. This instruction contained the following language which is the source of the claim of error made by plaintiffs: "You should consider such expert opinion and should weigh the reasons, if any, given for it. You are not bound, however, by such an opinion. Give it the weight to which you deem it entitled, whether that be great or slight, and you may reject it, if in your judgment the reasons given for it are unsound." Thereafter, the trial court gave the following instruction which is conceded to be a proper instruction: "In determining whether defendant's learning, skill and conduct fulfilled the duties imposed upon him by law, as they have been stated to you, you are not permitted to set up a standard of your own. The standard, I remind you, was set by the learning, skill and care ordinarily possessed and practiced by others of the same profession in good standing, in the same locality and under similar circumstances at the same time. It follows therefore that the only way you may properly learn that standard is through evidence in this trial by lawyers called as expert witnesses."

Plaintiffs contend that in a malpractice action the expert

testimony of a witness is conclusive upon the jury and that, therefore, it was error for the court to instruct the jury that it could disregard the uncontradicted testimony of plaintiffs' two expert witnesses as to the fact of defendant's failure to comply with the appropriate standard of care in the instant case. This contention has merit. Expert evidence in a malpractice suit is conclusive as to the proof of the prevailing standard of skill and learning in the locality and of the propriety of particular conduct by the practitioner in particular instances because such standard and skill is not a matter of general knowledge and can only be supplied by expert testimony. (*Engelking* v. *Carlson*, 13 Cal.2d 216, 221 [88 P.2d 695]; *Stephenson* v. *Kaiser Foundation Hospitals*, 203 Cal. App.2d 631, 635 [21 Cal.Rptr. 646].) This rule has been applied in California to medical malpractice cases, and while no cases have been found in this state applying the rule to legal malpractice, there is no reason why the rules of evidence for malpractice against a lawyer should not be the same as those governing cases against doctors. It has been so held in other jurisdictions. (See *Olson* v. *North*, 276 Ill.App. 457, 477, 495; *Dorf* v. *Relles* (7th Cir. 1966) 355 F.2d 488, 491-494.) Accordingly, when the matter in issue is within the knowledge of experts only and not within the common knowledge of laymen, expert evidence is conclusive and cannot be disregarded. (*Engelking* v. *Carlson, supra*; *Danielson* v. *Roche*, 109 Cal.App.2d 832, 835 [241 P.2d 1028]; *Peters* v. *Sacramento City Employees' Retirement System*, 27 Cal.App.2d 10, 15 [80 P.2d 179].)

The foregoing rule, however, does not require the jury to agree with the facts hypothesized; it is for the jury to find from all the evidence whether or not the facts assumed in a hypothetical question have been proved. (See *Guardianship of Jacobson*, 30 Cal.2d 312, 323-324 [182 P.2d 537]; *Sullivan* v. *City & County of San Francisco*, 95 Cal.App.2d 745, 762 [214 P.2d 82]; *People* v. *Becker*, 94 Cal.App.2d 434, 444 [210 P.2d 871]; and see McCormick, Evidence, pp. 29-32.) Accordingly, if the jury should find that any assumption in the hypothetical question has not been proved, they are to determine the effect of that failure of proof on the value and weight of the expert opinion based on that assumption.[8] The trial court did not purport to so instruct but instead erroneously instructed the jury that they were entitled to reject the opinion in toto if in their judgment the *reasons* given for it were unsound.

---

[8]See BAJI 33-C.

*Conclusion*

In the instant case the issue of negligence, which was one of law, was erroneously submitted to the jury as a question of fact, and the issue of proximate cause, which was one of fact, was properly submitted to the jury. Defendant urges that even if the issue of negligence should not have been submitted to the jury the judgment should be affirmed because the verdict can be upheld on the theory that defendant's negligence did not cause plaintiffs' damage. The rule relied upon by defendant is that declared by the Supreme Court in *Gillespie* v. *Rawlings,* 49 Cal.2d 359, 369 [317 P.2d 601], and is stated thusly in *Posz* v. *Burchell,* 209 Cal.App.2d 324, 335-336 [25 Cal.Rptr. 896] : ''Where several counts or issues are tried, a general verdict will not be disturbed by an appellate court if a single one of such counts or issues is supported by substantial evidence and is unaffected by error, although another is also submitted to the jury without any evidence to support it and with instructions inviting a verdict upon it.'' (See *Tucker* v. *Landucci,* 57 Cal.2d 762, 766-767 [22 Cal.Rptr. 10, 371 P.2d 754] ; and see concurring opinion of Justice Tobriner in *Clark* v. *Gibbons,* 66 Cal.2d 399, 415-416, fn. 1 [58 Cal.Rptr. 125, 426 P.2d 525], and cases there cited.)

A perusal of the cases which have applied the foregoing rule discloses that the rationale underlying the rule is that an appellate court will not disturb a general verdict merely because the trial court gave an abstractly correct instruction which the facts before it did not warrant or because the trial court submitted a count or issue to the jury without any evidence to support it and with instructions inviting a verdict upon it, provided that *another theory* on which the case was submitted to the jury finds substantial support in the evidence and is unaffected by error. This situation does not prevail in the present case because there was no theory or basis of liability at all which should have been submitted to the jury for their determination since defendant's negligence existed as a matter of law and the only issue which remained for the jury's consideration was whether there was a proximate causal connection between the negligence and the injury complained of. (See *Huebotter* v. *Follett,* 27 Cal.2d 765, 770 [167 P.2d 193].)

In the instant case it was incumbent upon the trial court properly to instruct the jury on the controlling legal

principles applicable to the case so that the jury would have a complete understanding of the law applicable to the facts; and the court was not relieved of this responsibility even though faulty or inadequate instructions were submitted by the parties or instructions were not submitted by the parties on the vital issues at all. (*Herbert* v. *Lankershim,* 9 Cal.2d 409, 482 [71 P.2d 220]; *Distefano* v. *Hall,* 218 Cal.App.2d 657, 672 [32 Cal.Rptr. 770]; *Jones* v. *Burgermeister Brewing Corp.,* 198 Cal.App.2d 198, 204 [18 Cal.Rptr. 311]; *Hardin* v. *Elvitsky,* 232 Cal.App.2d 357, 372 [42 Cal.Rptr. 748]; *Hodges* v. *Severns,* 201 Cal.App.2d 99, 113 [20 Cal.Rptr. 129].)

 Accordingly, in the present case, since negligence was established as a matter of law, it was incumbent upon the trial court so to instruct the jury. It was error, moreover, to submit to the jury as a question of fact an issue that on the record was one of law. (*Huebotter* v. *Follett, supra,* 27 Cal.2d at p. 770; see *Burks* v. *Blackman,* 52 Cal.2d 715, 719 [344 P.2d 301]; and see Code Civ. Proc., §§ 591, 592, and former Code Civ. Proc., § 2102, now Evid. Code, § 310.)

 In the case at bench the trial court left to the jury the question whether defendant breached his duty to the estate. The court gave instructions (including the afore-mentioned erroneous instruction on expert opinion) that defendant breached his duty if he were guilty of bad faith or negligence (as defined by the court). Under these instructions the jury may have determined that defendant was neither negligent nor guilty of bad faith. If the jury did so conclude, then they never determined the issue of proximate cause. Accordingly, we cannot affirm the judgment on the assumption that the jury found that defendant was negligent but that his negligence was not a proximate cause of plaintiffs' damage. The error in submitting the issue of negligence to the jury was prejudicial, because it may have precluded the jury from ever reaching the issue of proximate cause. Further, the erroneous instruction on expert opinion increases the possibility in this case that the jury verdict rests on an improper finding of no negligence, rather than on the possible theory of negligence without proximate cause.

The order denying plaintiffs' motion for a judgment notwithstanding the verdict is affirmed. The judgment is reversed with directions to the trial court that it retry the single issue of proximate cause, and thereupon to enter judgment as follows: for the defendant, if the jury finds that defendant's **negligence** was not a proximate cause of plaintiffs' damage;

for plaintiffs, in the amount previously determined by the trial court with accrued interest, if any, found to be due, if the jury finds that defendant's negligence was a proximate cause of plaintiffs' damage. It is also ordered that plaintiffs have and recover their costs incurred upon appeal herein.

Sims, J., and Elkington, J., concurred.

A petition for a rehearing was denied February 13, 1968.